# IN THE SUPREME COURT OF TEXAS

════════════
No. 09-0901
════════════

TEXAS RICE LAND PARTNERS, LTD. AND MIKE LATTA, PETITIONERS,

v.

DENBURY GREEN PIPELINE-TEXAS, LLC, RESPONDENT

═══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE NINTH DISTRICT OF TEXAS
═══════════════════════════════════════════════════════

**Argued April 19, 2011**

JUSTICE WILLETT delivered the opinion of the Court.

We deny the motion for rehearing. We withdraw our opinion of August 26, 2011 and substitute the following in its place.

The Texas Constitution safeguards private property by declaring that eminent domain can only be exercised for "public use."[1] Even when the Legislature grants certain private entities "the right and power of eminent domain,"[2] the overarching constitutional rule controls: no taking of property for private use.[3] Accordingly, the Natural Resources Code requires so-called "common

---

[1] TEX. CONST. art. I, § 17(a); *see also infra* note 13 and accompanying text.

[2] TEX. NAT. RES. CODE § 111.019(a).

[3] This restriction also bars "the taking of property . . . for transfer to a private entity for the primary purpose of economic development or enhancement of tax revenues." TEX. CONST. art. I, § 17(b).

carrier" pipeline companies to transport carbon dioxide "to or for the public for hire."[4]  In other words, a $CO_2$ pipeline company cannot wield eminent domain to build a *private* pipeline, one "limited in [its] use to the wells, stations, plants, and refineries of the owner."[5]  A common carrier transporting gas for hire implies a customer other than the pipeline owner itself.

This property-rights dispute asks whether a landowner can challenge in court the eminent-domain power of a $CO_2$ pipeline owner that has been granted a common-carrier permit from the Railroad Commission.  The court of appeals answered no, holding that (1) a pipeline owner can conclusively acquire the right to condemn private property by checking the right boxes on a one-page form filed with the Railroad Commission, and (2) a landowner cannot challenge in court whether the proposed pipeline will in fact be public rather than private.  We disagree.  Unadorned assertions of public use are constitutionally insufficient.  Merely registering as a common carrier does not conclusively convey the extraordinary power of eminent domain or bar landowners from contesting in court whether a planned pipeline meets statutory common-carrier requirements. Nothing in Texas law leaves landowners so vulnerable to unconstitutional private takings.  We reverse the court of appeals' judgment and remand to the district court for further proceedings consistent with this opinion.

## I.  Background

Denbury Resources, Inc. is a publicly traded Delaware corporation that owns all of Denbury Operating Company.  Denbury Operating Company has no employees or physical assets, but owns

---

[4] TEX. NAT. RES. CODE § 111.002(6).

[5] *Id*. § 111.003(a).

2

all the stock of two subsidiaries—Denbury Green Pipeline-Texas, LLC (Denbury Green) and Denbury Onshore, LLC. Denbury Resources and its affiliates (collectively Denbury) share corporate officers and are all located in the same offices in Plano, Texas.

Denbury is engaged in tertiary recovery operations that involve the injection of $CO_2$ into existing oil wells to increase production. Denbury owns a naturally occurring $CO_2$ reserve in Mississippi known as Jackson Dome, and desired to build a $CO_2$ pipeline from Jackson Dome to Texas oil wells to facilitate tertiary operations on the wells. The record contains some evidence that, in the future, Denbury might purchase man-made or "anthropogenic" $CO_2$ from third parties and transport it in the pipeline.

In March 2008, Denbury Green applied with the Railroad Commission to operate a $CO_2$ pipeline in Texas. This pipeline would be a continuation of a pipeline originating at Jackson Dome in Mississippi and traversing Louisiana. Denbury Green's portion of the pipeline would extend from the Texas-Louisiana border to the Hastings Field in Brazoria and Galveston counties. The one-page permit application, designated a Form T-4, has two boxes for the applicant to indicate whether the pipeline will be operated as "a common carrier" or "a private line." Denbury Green placed an "x" in the common-carrier box. Separately and also relevant to common-carrier status, applicants are directed to mark one of three boxes if the pipeline will not be transporting "only the gas and/or liquids produced by pipeline owner or operator." Of the three boxes, indicating the gas will be "[p]urchased from others," "[o]wned by others, but transported for a fee," or "[b]oth purchased and transported for others," Denbury Green marked the box for "[o]wned by others, but transported for a fee." Denbury Green also submitted a letter, pursuant to Section 111.002(6) of the Natural

3

Resources Code,[6] stating that it "accepts the provisions of Chapter 111 of the Natural Resources Code and expressly agrees that it is a common carrier subject to duties and obligations conferred by Chapter 111."

In April 2008, eight days after Denbury Green filed its application, the Commission granted the T-4 permit. In July 2008, the Commission furnished a letter to Denbury Green, stating:

> This letter is to confirm the fact that [Denbury Green] has been granted a permit to operate a pipeline (Permit No. 07737) and has made all of the currently necessary filings to be classified as a common carrier pipeline for transportation of carbon dioxide under the provisions of [Section 111.002(6)] and as otherwise required by the [Commission].

In November 2008, Denbury Green filed a tariff with the Commission setting out terms for the transportation of gas in the pipeline. The administrative process for granting the permit was conducted without a hearing and without notice to landowners along the proposed pipeline route.

Texas Rice Land Partners, Ltd. has an ownership interest in two tracts along the pipeline route. When Denbury Green came to survey the land in preparation for condemning a pipeline easement, Texas Rice Land Partners and a lessee, rice farmer Mike Latta (collectively Texas Rice), refused entry. Denbury Green sued Texas Rice for an injunction allowing access to the tracts.[7] On cross-motions for summary judgment, the trial court rendered judgment in favor of Denbury Green. The trial court found that Denbury Green "is a 'common carrier' pursuant to Section 111.002(6) of

---

[6] TEX. NAT. RES. CODE § 111.002(6). Unless otherwise indicated, all statutory references below are to the Natural Resources Code, Chapter 111 of which governs common carriers of $CO_2$ and other substances.

[7] Denbury Green filed a separate suit in county court to condemn a pipeline easement. The parties state in their briefing that the county court suit was stayed pending the outcome of the case before us, but Denbury Green stated at oral argument that the pipeline has been completed.

the Texas Natural Resources Code" and "has the power of eminent domain/authority to condemn/right-to-take pursuant to Section 111.019 of the Texas Natural Resources Code." The court permanently enjoined Texas Rice from (1) interfering with Denbury Green's "right to enter and survey" its proposed pipeline route across Texas Rice's land, and (2) harassing Denbury Green or its agents and contractors while conducting the surveys.

The court of appeals affirmed, concluding that Denbury Green had established as a matter of law its common-carrier status.[8] The court relied on the fact that the pipeline "will be available for public use from the outset of its operation."[9] One justice dissented, believing genuine issues of material fact precluded summary judgment.[10] The dissent reasoned that eminent-domain power cannot extend to the taking of property for private use and that "[m]erely offering a transportation service for a profit does not distinguish a private use from a public use."[11]

## II. Discussion

### A. Common Carriers and the Power of Eminent Domain

The Natural Resources Code regulates $CO_2$ pipelines serving as common carriers. Three Code provisions are particularly relevant.

Section 111.002(6) states a person is a common carrier if he:

---

[8] 296 S.W.3d 877, 878, 881.

[9] *Id.* at 881.

[10] *Id.* at 881, 884 (Gaultney, J., dissenting).

[11] *Id.* at 883.

owns, operates, or manages, wholly or partially, pipelines for the transportation of carbon dioxide . . . to or for the public for hire, but only if such person files with the commission a written acceptance of the provisions of this chapter expressly agreeing that, in consideration of the rights acquired, it becomes a common carrier subject to the duties and obligations conferred or imposed by this chapter.

Section 111.003(a) states:

The provisions of this chapter do not apply to pipelines that are limited in their use to the wells, stations, plants, and refineries of the owner and that are not a part of the pipeline transportation system of a common carrier as defined in Section 111.002 of this code.

Section 111.019 states in part:

(a)  Common carriers have the right and power of eminent domain.
(b)  In the exercise of the power of eminent domain granted under the provisions of Subsection (a) of this section, a common carrier may enter on and condemn the land, rights-of-way, easements, and property of any person or corporation necessary for the construction, maintenance, or operation of the common carrier pipeline.

While these provisions plainly give private pipeline companies the power of eminent domain, that authority is subject to special scrutiny by the courts. The power of eminent domain is substantial[12] but constitutionally circumscribed. Article 1, Section 17 of the Texas Constitution provides, "No person's property shall be taken . . . for or applied to public use without adequate compensation . . . ." This provision not only requires just compensation to the property owner, but also "prohibits the taking of property for *private* use."[13]

---

[12] *See Incorporated Town of Hempstead v. Gulf States Utils. Co.*, 206 S.W.2d 227, 229 (Tex. 1947) (noting "extraordinary power of eminent domain" granted to private utilities).

[13] *Maher v. Lasater*, 354 S.W.2d 923, 924 (Tex. 1962). Denbury and certain amici curiae supporting Denbury contend that their positions are buttressed by the passage of Senate Bill 18 in the last session. Act of May 6, 2011, 82d Leg., R.S., ch. 81, 2011 Tex. Gen. Laws 354. This bill amended various statutory provisions relating to eminent domain, including Section 2206.001 of the Government Code. That section previously provided that "[a] governmental or private entity may not take private property through the use of eminent domain if the taking . . . confers a private benefit on a particular private party through the use of the property" or "is for a public use that is merely a pretext to confer a private

6

The legislative grant of eminent-domain power is strictly construed in two regards. First, strict compliance with all statutory requirements is required.[14] Second, in instances of doubt as to the scope of the power, the statute granting such power is "strictly construed in favor of the landowner and against those corporations and arms of the State vested therewith."[15]

## B. The T-4 Permit Granted By the Railroad Commission Does Not Conclusively Establish Eminent-Domain Power

The parties dispute whether Denbury Green was entitled to summary judgment on the issue of whether it is a common carrier. We hold at the outset that the T-4 permit alone did not conclusively establish Denbury Green's status as a common carrier and confer the power of eminent domain.

benefit on a particular private party." This provision is consistent with our view, stated above, that the taking of property for private use is constitutionally proscribed. Section 2206.001 was amended to add a new subsection providing that a government or private party may not take private property if the taking "is not for a public use," and S.B. 18 replaced references to "public purpose" in several provisions with "public use," again consistent with our above-stated view. As before, Section 2206.001(c) states that the entirety of Section 2206.001 does not apply to certain entities including common carrier pipelines. However, S.B. 18 added Section 2206.002 to the Government Code, which increases the rights of property owners subject to pipeline easements by providing that the owner can build roads over the easement. S.B. 18 also added procedural protections for property owners, now set out in Sections 2206.051–.053 and elsewhere, such as a requirement in Section 2206.053 that governments must now authorize the initiation of a condemnation proceeding at a public meeting. There is no question that S.B. 18 was intended to increase the rights of property owners facing condemnation proceedings. Denbury concedes that the bill "reformed eminent domain law by imposing new requirements that further protect landowners' rights." It specifically gave property owners new rights with respect to pipeline easements. The fact that the bill left intact a provision exempting common carrier pipelines from one section of the Government Code does not persuade us that we are misreading the Constitution or the Natural Resources Code. The Legislature's desire through S.B. 18 to give *more* protection to some landowners does not imply that it intended to *dilute* the extant property rights of others. S.B. 18 did not diminish Texas Rice's property rights.

[14] *State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 640 (Tex. 2001) ("Proceedings to condemn land are special in character, and the party attempting to establish its right to condemn must show strict compliance with the law authorizing private property to be taken for public use.").

[15] *Coastal States Gas Producing Co. v. Pate*, 309 S.W.2d 828, 831 (Tex. 1958).

7

Nothing in the statutory scheme indicates that the Commission's decision to grant a common-carrier permit carries conclusive effect and thus bars landowners from disputing in court a pipeline company's naked assertion of public use. As stated above, the right to condemn property is constitutionally limited and turns in part on whether the use of the property is public or private. We have long held that "the ultimate question of whether a particular use is a public use is a judicial question to be decided by the courts."[16] We have also held in numerous contexts that the Commission does not have authority to determine property rights.[17] We presume the Legislature is aware of relevant caselaw when it enacts statutes.[18] Had the Legislature intended a T-4 permit to render a company's common-carrier status and eminent-domain power unchallengeable, it would have said so explicitly. "[W]hen an action is inherently judicial in nature, the courts retain jurisdiction to determine the controversy unless the legislature by valid statute has expressly granted exclusive jurisdiction to the administrative body."[19]

---

[16] *Maher*, 354 S.W.2d at 925; *see also Housing Auth. of Dallas v. Higginbotham*, 143 S.W.2d 79, 84 (Tex. 1940) ("The question of what is public use is a question for the courts . . . ."); *Mercier v. MidTexas Pipeline Co.*, 28 S.W.3d 712, 722 (Tex. App.—Corpus Christi 2000, pet. denied) (holding that authority of pipeline company to condemn land was "an issue that was appropriately determined as a matter of law by the court").

[17] *See Amarillo Oil Co. v. Energy-Agri Prods., Inc.*, 794 S.W.2d 20, 26 (Tex. 1990) ("The cause is properly within the jurisdiction of the courts because the Railroad Commission has no authority to determine title to land or property rights."); *R.R. Comm'n v. City of Austin*, 524 S.W.2d 262, 267–68 (Tex. 1975) ("This Court has also held on several occasions that the Commission does not have power to determine title to land or property rights."); *Jones v. Killingsworth*, 403 S.W.2d 325, 328 (Tex. 1965) ("The Railroad Commission has no power to determine property rights."); *Nale v. Carroll*, 289 S.W.2d 743, 745 (Tex. 1956) ("Rules and regulations of the Railroad Commission cannot effect a change or transfer of property rights."); *Ryan Consol. Petroleum Corp. v. Pickens*, 285 S.W.2d 201, 207 (Tex. 1955) ("[The Commission] has not been given the power to determine property rights as between litigants.").

[18] *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 596 (Tex. 2001) ("[T]he Legislature is presumed to be aware of case law relevant to statutes it amends or enacts."); *Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990) ("A statute is presumed to have been enacted by the legislature with complete knowledge of the existing law and with reference to it.").

[19] *Amarillo Oil*, 794 S.W.2d at 26.

Further, the record, rules, and statutes before us indicate that the Commission's process for granting a T-4 permit undertakes no effort to confirm that the applicant's pipeline will be public rather than private. The Commission's website states that the Commission "does not have the authority to regulate any pipelines with respect to the exercise of their eminent domain powers."[20] A spokesperson for the Commission stated in 2008 that it had never denied a T-4 permit, and that the Commission grants them for "administrative purposes."[21] Apparently, in order to receive a common-carrier permit, the applicant need only place an "x" in a box indicating that the pipeline will be operated as a common carrier, and to agree under Section 111.002(6) to subject itself to "duties and obligations conferred or imposed" by Chapter 111. Under these minimal requirements, Denbury Green reported itself as a common carrier and obtained a permit a few days later. There was no investigation, and certainly no adversarial testing, of whether Denbury Green was indeed entitled to common-carrier status and the extraordinary power to condemn private property. Denbury Green concedes in its brief that the Commission "did not adjudicate anything." Private property cannot be imperiled with such nonchalance, via an irrefutable presumption created by checking a certain box on a one-page government form. Our Constitution demands far more.

The Railroad Commission's process for handling T-4 permits appears to be one of registration, not of application. The record suggests that in accepting an entity's paperwork, the

---

[20] Railroad Commission of Texas, *Pipeline Eminent Domain and Condemnation Frequently Asked Questions (FAQs),* http://www.rrc.state.tx.us/about/faqs/eminentdomain.php (last visited Feb. 14, 2012).

[21] Amanda B. Niles, Comment, *Eminent Domain and Pipelines in Texas: It's As Easy As 1,2,3, — Common Carriers, Gas Utilities and Gas Corporations*, 16 TEX. WESLEYAN L. REV. 271, 288 (2010) (quoting Mike Lee, *Pipeline Builders May Face Quandary*, FORT WORTH STAR-TELEGRAM, June 22, 2008, at 1B, available at http://startelegram.typepad.com/files/pipeline-builders-may-face-quandary.htm).

Commission performs a clerical rather than an adjudicative act. The registrant simply submits a form indicating its desire to be classified as a common (or private) carrier. No notice is given to affected parties. No hearing is held, no evidence is presented, no investigation is conducted. It is true that Commission regulations covering $CO_2$ pipelines (1) state that permit applications will be granted if the Commission is satisfied "from such application and the evidence in support thereof, and its own investigation" that the pipeline will "reduce to a minimum the possibility of waste, and will be operated in accordance with the conservation laws and conservation rules and regulations of the commission," and (2) require $CO_2$ pipelines to comply with certain safety requirements.[22] However, as for the core constitutional concern—the pipeline's public vs. private use—the parties point to no regulation or enabling legislation directing the Commission to investigate and determine whether a pipeline will in fact serve the public. Given this scant legislative and administrative scheme, we cannot conceive that the Legislature intended the granting of a T-4 permit alone to prohibit a landowner—who was not a party to the Commission permitting process and had no notice of it—from challenging in court the eminent-domain power of a permit holder.

### C. The Test for Common-Carrier Status

To qualify as a common carrier with the power of eminent domain, the pipeline must serve the public; it cannot be built only for the builder's exclusive use. As explained above, extending the power of eminent domain to the taking of property for a private use cannot survive constitutional scrutiny. The Denbury Green pipeline would not serve a public use if it were built and maintained

---

[22] 16 TEX. ADMIN. CODE §§ 3.70(a), 8.1(a)(1)(C), 8.1(b)(2)–(3).

only to transport gas belonging to Denbury from one Denbury site to another. In such circumstances, and in the absence of compelling legislative findings and declaration of public purpose, we can see no purpose other than a purely private one.[23]

The relevant statutes also confirm that a $CO_2$ pipeline owner is not a common carrier if the pipeline's only end user is the owner itself or an affiliate. Section 111.002(6) states a person is a common carrier if it owns or operates a pipeline "for the transportation of carbon dioxide . . . to or for the public for hire." If Denbury consumes all the pipeline product for itself, it is not transporting gas "to . . . the public for hire." Nor can such an arrangement be characterized as transportation of gas "for the public for hire." The term "for the public for hire" implies that the gas is being carried for another who retains ownership of the gas, and that the pipeline is merely a transportation conduit rather than the point where title is transferred.[24] Section 111.003(a) further confirms these notions, since it states that the common-carrier provisions "do not apply to pipelines that are limited in their use to the wells, stations, plants, and refineries of the owner and that are not a part of the pipeline transportation system of a common carrier as defined in Section 111.002 of this code."

---

[23] *See, e.g.*, *Mercier*, 28 S.W.3d at 718 (noting that pipeline indisputably "is not a common carrier" when it "does not transport gas or allow the dedication of its capacity to the public or anyone other than" the two corporate owners of the pipeline). We further note that the pipeline does not serve a public use if it only transports gas for a corporate parent or affiliate. Hence, we see no significance to the fact that Denbury Green Pipeline-Texas, LLC, the owner of the pipeline here, is a wholly owned subsidiary of the company engaged in the tertiary recovery operations. Transporting gas solely for the benefit of a corporate parent or other affiliate is not a public use of the pipeline. Moreover, even if the Legislature included findings and an explicit declaration of public purpose, such material, while undeniably instructive, would not be entitled to insurmountable deference.

[24] *See Thedford v. Cnty. of Jackson*, 502 S.W.2d 899, 901 (Tex. Civ. App.—Corpus Christi 1973, writ ref'd n.r.e.) (holding that owner of interest in well who wished to construct pipeline to transport only his own gas was not a common carrier because a pipeline owner transporting his own gas was neither transporting gas "bought of others" under relevant common carrier statute nor transporting gas "for hire").

Denbury Green contends that merely making the pipeline available for public use is sufficient to confer common-carrier status. We disagree, for two reasons. First, this argument is inconsistent with the wording of Section 111.002(6). The statute provides that a common carrier owns or operates a $CO_2$ pipeline "to or for the public for hire, but only if such person files with the commission a written acceptance" agreeing to become "a common carrier subject to the duties and obligations conferred or imposed by this chapter." Denbury Green points out that Chapter 111 contains common-carrier requirements such as the obligation to publish a tariff in Section 111.014, and the obligation not to discriminate among shippers in Section 111.016. But Denbury Green's reading of Section 111.002(6) would confer common-carrier status and eminent-domain power even when the pipeline will never serve the public by transporting $CO_2$ "to or for the public for hire" under the statute—and indeed when there was never any reasonable possibility of such service—so long as the owner agrees to be subject to the Chapter 111 common-carrier regime. As we read the statute, the language that the pipeline be owned or operated "to or for the public for hire" is a separate requirement for common-carrier status, and the statute, *in addition*, requires the owner or operator to agree to subject itself to Chapter 111. Denbury Green's interpretation would read out of the statute the language that the pipeline be operated "to or for the public for hire." Such a reading contravenes two settled rules: (1) that every word in a statute is presumed to have a purpose and should be given effect if reasonable and possible;[25] and (2) that strict compliance with all statutory

---

[25] *See Tex. Workers' Comp. Ins. Fund v. DEL Indus., Inc.*, 35 S.W.3d 591, 593 (Tex. 2000); *see also Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 402 (Tex. 2000) ("[W]e give effect to all words of a statute, and, if possible, do not treat any statutory language as mere surplusage.").

requirements is required to exercise eminent domain.[26]  Even absent these rules, the use of "but only

if" in the statute suggests that a pipeline operator must meet two requirements to obtain common-

carrier status under Chapter 111.  It must first meet a broad requirement—that it operate "to or for

the public for hire."  But it can qualify as a Chapter 111 common carrier if and "only if" it meets an

additional requirement—that it subject itself to Commission regulation under Chapter 111.  Again,

Denbury Green's reading ignores the first requirement and would confer common-carrier status when

the second requirement alone is met.

Second, Denbury Green's construction leads to a result that we cannot believe the Legislature

intended, namely a gaming of the permitting process to allow a private carrier to wield the power of

eminent domain.  Suppose an oil company has a well on one property and a refinery on another.  A

farmer's property lies between the oil company's two properties.  The oil company wishes to build

a pipeline for the exclusive purpose of transporting its production from its well to its refinery.  Only

about 50 feet of the proposed pipeline will traverse the farmer's property.  The farmer refuses to

allow construction of the pipeline across his property.  The oil company knows that no party other

than itself will ever desire to use the pipeline.  In these circumstances, the application for a common-

carrier permit is essentially a ruse to obtain eminent-domain power.  The oil company should not be

able to seize power over the farmer's property simply by applying for a crude oil pipeline permit with

the Commission, agreeing to subject itself to the jurisdiction of the Commission and all requirements

of Chapter 111, and offering the use of the pipeline to non-existent takers.  "A sine qua non of lawful

---

[26] *See supra* note 14 and accompanying text.

13

taking . . . for or on account of public use . . . is that the professed use be a public one in truth. Mere fiat, whether pronounced by the Legislature or by a subordinate agency, does not make that a public use which is not such in fact . . . ."[27] Hence, we conclude that Denbury Green is not entitled to common-carrier status simply because it obtained a common-carrier permit, filed a tariff, and agreed to make the pipeline available to any third party wishing to transport its gas in the pipeline and willing to pay the tariff. The statute does not allow such a result, particularly in light of the rule, stated above, that statutes granting eminent-domain power must be strictly construed in favor of the landowner.

We accordingly hold that for a person intending to build a $CO_2$ pipeline to qualify as a common carrier under Section 111.002(6),[28] a reasonable probability[29] must exist that the pipeline will at some point after construction serve the public by transporting gas for one or more customers who will either retain ownership of their gas[30] or sell it to parties other than the carrier.

Consistent with judicial review of Commission determinations generally, a permit granting common-carrier status is prima facie valid.[31] But once a landowner challenges that status, the burden

---

[27] *Higginbotham*, 143 S.W.2d at 84 (quoting *Dallas Cotton Mills v. Indus. Co.*, 296 S.W. 503, 505 (Tex. Comm'n App. 1927, judgm't adopted)).

[28] Our decision today is limited to persons seeking common-carrier pipeline status under Section 111.002(6). We express no opinion on pipelines where common-carrier status is at issue under other provisions of the Natural Resources Code or elsewhere.

[29] In this context, a reasonable probability is one that is more likely than not.

[30] We do not mean to suggest here that customers must trace the gas they placed in the pipeline or that ordinary business practices accommodating the commingling of gas in a pipeline cannot be employed.

[31] *See* TEX. NAT. RES. CODE § 85.243 (providing generally that when party challenges Commission order, "the burden of proof shall be on the party complaining of the law or order, and the law or order is deemed prima facie valid"); *Cheesman v. Amerada Petroleum Corp.*, 227 S.W.2d 829, 831 (Tex. Civ. App.—Austin 1950, no writ) ("It must be

14

falls upon the pipeline company to establish its common-carrier bona fides if it wishes to exercise the power of eminent domain.

### D. Denbury Green Was Not Entitled to Summary Judgment

Under our test, Denbury Green did not establish common-carrier status as a matter of law. A Denbury Green vice president attested that Denbury Green was negotiating with other parties to transport anthropogenic $CO_2$ in the pipeline, and that the pipeline "can transport carbon dioxide tendered by Denbury entities as well as carbon dioxide tendered from other entities and facilities not owned by Denbury." This affidavit does not indicate whether Denbury Green itself intended to use all of that gas for its own tertiary recovery operations. As discussed above, a carrier is not a common carrier if it transports gas only for its own consumption. The witness also stated in his deposition that the $CO_2$ carried in the pipeline would be owned by affiliate Denbury Onshore, but that there was "the possibility we'll be transporting other people's CO2 in the future." He did not identify any possible customers and was unaware of any other entity unaffiliated with Denbury Green that owned $CO_2$ near the pipeline route in Louisiana and Mississippi. This evidence does not establish a reasonable probability that such transportation would ever occur.

Further, the record includes portions of Denbury's own website that suggest the pipeline would be exclusively for private use. In describing the pipeline project, the site states:

> We like these tertiary operations because . . . to date, in our region of the United States, we have not encountered any industry competition. Generally, from the Texas Gulf Coast to Florida, there are no known significant natural sources of carbon

---

remembered that the Commission granted the permit which Amerada attacked by filing suit in the court below. The permit carried a prima facie presumption of validity."). Texas Rice, in a letter brief, acknowledges that "the pipeline permit from the Railroad Commission could serve as prima facie proof of the right to condemn."

15

dioxide except our own, and these large volumes of $CO_2$ are the foundation for our entire tertiary program.

. . . .

We have entered into three agreements, and are having various levels of discussions with many others, to purchase (if the plants are built) all of the $CO_2$ production from man-made (anthropogenic) sources of $CO_2$ from planned solid carbon gasification projects.

. . . .

We see these sources as a possible expansion of our natural Jackson Dome source, assuming they are economical, and we believe that our potential ability to tie these sources together with pipelines will give us a significant advantage over our competitors, in our geographic area, in acquiring additional oil fields and these future potential man-made sources of $CO_2$.

. . . .

We are also working on a 24" pipeline, named the Green Pipeline, to transport $CO_2$ to Hastings Field and our 2007 Southeast Texas acquisitions . . . . Initially, we anticipate transporting $CO_2$ from our natural source at Jackson Dome in this line, but ultimately we expect that it will be used to ship predominately man-made (anthropogenic) sources of $CO_2$.

. . . .

During November 2006, we acquired an option to purchase . . . Hastings Field, a strategically significant potential tertiary flood candidate located near Houston, Texas.

. . . .

We believe that Hastings Field possesses . . . more reserve potential than any other single field in our inventory. Currently, we are working on the right-of-ways required to build a pipeline we have named our Green Pipeline to transport $CO_2$ to this field . . . . [O]ur goal is to continue to pursue the acquisition of other fields in this area, which will help reduce the cost of $CO_2$ for each field by fully utilizing the proposed pipeline and thereby reducing our transportation cost per Mcf.

As the dissent in the court of appeals noted, these statements are "some evidence Denbury intends to fully utilize the Green Pipeline as an essential part of its tertiary oil production operations. Denbury's description of the pipeline's purpose indicates the $CO_2$ it transports in the pipeline will be its own . . . ."[32] Denbury Green's representations suggesting that it (1) owns most or all of the

---

[32] 296 S.W.3d at 882 (Gaultney, J., dissenting).

naturally occurring $CO_2$ in the region, (2) intends to purchase all the man-made $CO_2$ that might be produced under current and future agreements, (3) sees its access to $CO_2$ as giving it a significant advantage over its competitors, and (4) intends to fully utilize the pipeline for its own purposes, are all inconsistent with public use of the pipeline. As Denbury Green did not establish common-carrier status as a matter of law, it was not entitled to summary judgment.

### III. Conclusion

Pipeline development is indisputably important given our State's fast-growing energy needs, but economic dynamism—and more fundamentally, freedom itself—also demand strong protections for individual property rights. Locke deemed the preservation of property rights "[t]he great and chief end" of government,[33] a view this Court echoed almost 300 years later, calling it "one of the most important purposes of government."[34] Indeed, our Constitution and laws enshrine landownership as a keystone right, rather than one "relegated to the status of a poor relation."[35]

A private enterprise cannot acquire unchallengeable condemnation power under Section 111.002(6) merely by checking boxes on a one-page form and self-declaring its common-carrier status. Merely holding oneself out is insufficient under Texas law to thwart judicial review. While

---

[33] JOHN LOCKE, SECOND TREATISE OF GOVERNMENT Chap. IX, Sec. 124 (C.B. McPherson, ed., Hackett Publishing Co. 1980) (1690).

[34] *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977). Private property rights have been described as "fundamental, natural, inherent, inalienable, not derived from the legislature and as preexisting even constitutions." *Id.* They are, in short, a foundational liberty, not a contingent privilege.

[35] *Dolan v. City of Tigard*, 512 U.S. 374, 392 (1994); *see also generally* JAMES W. ELY, JR., THE GUARDIAN OF EVERY OTHER RIGHT: A CONSTITUTIONAL HISTORY OF PROPERTY RIGHTS (3d ed. 2008).

17

neighboring states impose fewer restrictions on the level of public use required for such takings,[36] meaning companies may seize land to build pipelines for their exclusive use,[37] the Texas Legislature enacted a regime more protective of landowners. If a landowner challenges an entity's common-carrier designation, the company must present reasonable proof of a future customer, thus demonstrating that the pipeline will indeed transport "to or for the public for hire" and is not "limited in [its] use to the wells, stations, plants, and refineries of the owner." We reverse the court of appeals' judgment, and remand this case to the district court for further proceedings consistent with this opinion.

_____
Don R. Willett
Justice

**OPINION DELIVERED:** March 2, 2012

---

[36] LA. REV. STAT. ANN. § 19:2; MISS. CODE ANN. § 11-27-47.

[37] *See ExxonMobil Pipeline Co. v. Union Pac. R.R. Co.*, 35 So.3d 192, 199 (La. 2010) (holding that "any allocation to a use resulting in advantages to the public at large will suffice to constitute a public purpose").