**Opinion filed July 21, 2016**



In The

# Eleventh Court of Appeals

_____

## No. 11-14-00199-CV

_____

## WALTER B. SANER, Appellant

## V.

## BRIDGETEX PIPELINE COMPANY, LLC, Appellee

**On Appeal from the 220th District Court**
**Comanche County, Texas**
**Trial Court Cause No. CV17313**

## O P I N I O N

This is a condemnation case. Walter B. Saner owns a tract of land in Comanche County. BridgeTex Pipeline Company, LLC instituted condemnation proceedings to obtain an easement for a crude petroleum pipeline running across Saner's land. The trial court found that BridgeTex's proposed taking was for a common carrier pipeline, which is a statutorily permitted public use. In one issue,

Saner asserts that the trial court erred when it found that the pipeline was for "public use" as required by Article I, Section 17 of the Texas constitution.[1] We affirm.

*Background Facts*

BridgeTex is a limited liability company engaged in the location and construction of a pipeline in Texas for the transportation of crude petroleum. The pipeline is intended to transport crude petroleum from the Permian Basin to the Texas Gulf Coast. In January 2013, the Texas Railroad Commission designated BridgeTex as a common carrier and granted it a T-4 permit. Pursuant to its designation as a common carrier, BridgeTex exercised the power of eminent domain and obtained an easement by condemnation across Saner's real property in Comanche County. The special commissioners determined the amount of compensation to which Saner was entitled to be $5,930. Saner did not challenge the amount of the compensation award in the trial court. Instead, he only challenged the commissioners' finding that the easement was for public use.

The parties litigated the "public use" question in a one-day bench trial. The trial court ruled in favor of BridgeTex and entered written findings of fact and conclusions of law. Among other things, the trial court found that "BridgeTex is a common carrier, the Pipeline will be operated as such, and the taking herein of Defendant's Property for the Pipeline is for a public use."

*Analysis*

In one issue, Saner asserts that the trial court erred when it found that the pipeline built across his property by BridgeTex was for "public use." "The Texas Constitution safeguards private property by declaring that eminent domain can only be exercised for 'public use.'" *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline-Tex., LLC*, 363 S.W.3d 192, 194 (Tex. 2012) (quoting TEX. CONST. art. I,

---

[1]Saner challenged the constitutionality of various provisions of the Texas Natural Resources Code at trial but has not raised these issues on appeal.

§ 17).  The ultimate question of whether a particular use is a public use is a judicial question to be decided by the courts as a matter of law.  *Id.* at 198 n.16.

*Denbury* involved a carbon dioxide ($CO_2$) pipeline company that had been granted the power of eminent domain by the Railroad Commission as a "common carrier" pipeline company pursuant to the provisions of the Natural Resources Code. *Id.* at 194–95; *see* TEX. NAT. RES. CODE ANN. § 111.002(6) (West 2011) (applicable to pipelines for the transportation of carbon dioxide).  The Texas Supreme Court held that the common carrier permit granted by the Railroad Commission did not conclusively establish the pipeline owner's power of eminent domain.  *Denbury*, 363 S.W.3d at 195.  Instead, the court held that a landowner can challenge the eminent-domain power of the pipeline company by contesting whether the proposed pipeline will in fact be public, rather than private.  *Id.*

The court held in *Denbury* that "[t]o qualify as a common carrier with the power of eminent domain, [a] pipeline must serve the public; it cannot be built *only for the builder's exclusive use*."  363 S.W.3d at 200 (emphasis added).  The court explained that "extending the power of eminent domain to the taking of property for a private use cannot survive constitutional scrutiny" and that "[t]he Denbury Green pipeline would not serve a public use if it were built and maintained *only to transport gas belonging to Denbury from one Denbury site to another*."  *Id.* (emphasis added). This recognition of what does not qualify as public use is mirrored in Section 111.003 of the Natural Resources Code, which denies common carrier status to pipelines "that are limited in their use to the wells, stations, plants, and refineries of the owner."  NAT. RES. § 111.003 (West Supp. 2015).

After recognizing what does not qualify as public use, the court established a test to determine what does qualify as public use for a carbon dioxide pipeline.  *See Denbury*, 363 S.W.3d at 202.  The court held that, "for a person intending to build a $CO_2$ pipeline to qualify as a common carrier under Section 111.002(6), a reasonable

3

probability must exist that the pipeline will at some point after construction serve the public by transporting gas for one or more customers who will either retain ownership of their gas or sell it to parties other than the carrier." *Id.* (footnotes omitted); *cf. Coastal States Gas Producing Co. v. Pate*, 309 S.W.2d 828, 833 (Tex. 1958) (holding that "[n]o hard and fast rule can be laid down for determining public use . . . each case is usually decided upon the basis of its own facts and the surrounding circumstances"). But the *Denbury* court also provided that "[o]ur decision today is limited to persons seeking common-carrier pipeline status under Section 111.002(6)," applicable to carbon dioxide pipelines, and that "[w]e express no opinion on pipelines where common-carrier status is at issue under other provisions of the Natural Resources Code or elsewhere." *Denbury*, 363 S.W.3d at 202 n.28.

Like the pipeline company in *Denbury*, BridgeTex was designated as a common carrier pipeline company by the Railroad Commission. However, BridgeTex's designation as a common carrier pipeline company arose under another provision of the Natural Resources Code. Section 111.002(1) provides that a person is a common carrier if it "owns, operates, or manages a pipeline or any part of a pipeline in the State of Texas for the transportation of crude petroleum to or for the public for hire, or engages in the business of transporting crude petroleum by pipeline." NAT. RES. § 111.002(1).

Despite *Denbury*'s limitation to carbon dioxide pipelines, our sister courts have applied its "reasonable probability" test to other provisions of the Natural Resources Code, including the provision granting common carrier status to crude petroleum pipelines. *See Crawford Family Farm P'ship v. TransCanada Keystone Pipeline, L.P.*, 409 S.W.3d 908, 922 (Tex. App.—Texarkana 2013, pet. denied) (applying *Denbury* reasonable probability test to crude petroleum pipeline); *see also Crosstex NGL Pipeline, L.P. v. Reins Rd. Farms-1, Ltd.*, 404 S.W.3d 754, 761 (Tex.

4

App.—Beaumont 2013, no pet.) (applying *Denbury* reasonable probability test to natural gas liquids pipeline). In *Crosstex*, the Beaumont Court of Appeals addressed the self-imposed limitation in *Denbury* and nonetheless held that "we are not persuaded the Court's reasoning concerning the process of obtaining a T–4 permit applies only to carbon dioxide lines." *Crosstex*, 404 S.W.3d at 761. Saner expressly acknowledges in his brief that *Denbury*'s reasoning "is broadly applicable to crude oil."

We find the reasoning of our sister courts persuasive. There is no distinction between crude petroleum common carriers under Section 111.002(1) and carbon dioxide common carriers under Section 111.002(6) that would justify a departure from *Denbury*'s reasonable probability test. *See* NAT. RES. § 111.002(1), (6). Both provisions reference the constitutional "public use" requirement and grant common carrier status only when the pipelines are operated "to or for the public for hire." *Id.* And both provisions are subject to Section 111.003, which, as stated previously, denies common carrier status to private pipelines, i.e., pipelines "that are limited in their use to the wells, stations, plants, and refineries of the owner." *Id.* § 111.003. We join our sister courts in concluding that *Denbury*'s reasonable probability test applies to other types of common carrier pipelines. Accordingly, to satisfy the constitutional "public use" requirement, we hold that, for a person intending to build a pipeline under Section 111.002(1), a reasonable probability must exist that the pipeline will at some point after construction serve the public by transporting crude petroleum for one or more customers who will either retain ownership of their crude petroleum or sell it to parties other than the carrier. *See Denbury*, 363 S.W.3d at 202.

With *Denbury* in mind, the trial court in this case found that "there is a reasonable probability that the Pipeline will, at some point after construction, serve the public by transporting crude oil for one or more customers, not affiliated with

5

BridgeTex, who will either retain ownership of their crude oil or sell it to parties other than BridgeTex." This finding is supported by the record. A representative of BridgeTex testified at trial that BridgeTex has entered into a transportation services agreement with a shipper, who is not an affiliate or subsidiary of BridgeTex, and that this shipper is obligated to ship 10,000 barrels of crude oil a day through the pipeline for seven years. The representative also testified that BridgeTex was in negotiations with twelve to fourteen other third-party shippers who may either become contract shippers or spot shippers. He explained that the Federal Energy Regulatory Commission requires BridgeTex, as a common carrier, to set aside ten percent of the pipeline's capacity for spot shippers, who are essentially walk-up customers. He further testified that, although the pipeline was still a couple of months away from start-up, BridgeTex had received five unsolicited applications from prospective spot shippers and that two of the applications had been approved while three were in the process of approval. The representative also explained that the pipeline will be connected to seven to ten refineries, not owned by BridgeTex, along the Texas Gulf Coast.

Irrespective of the holding in *Denbury* and the evidence offered at trial satisfying its reasonable probability test, Saner challenges whether the pipeline built across his property is for public use. He contends that the pipeline is not for public use because "[o]nly crude oil producers will use the pipeline." Saner contends that "public" should be defined as "*everyone* or *the masses*." He asserts that the Texas constitution requires what he refers to as "actual use" by the public. Actual use by the public, according to Saner, is exemplified when "[a] member of the general public is a customer and he uses the electric line grid system that goes all the way to house [sic] when he plugs in an appliance." Saner explains that "[s]o when a transmission line comes to a house and connects to the house, one can pull off the transmission line as much electricity as needed as a member of the general public.

6

This is what is contemplated by the phrase '**public use**' in the Texas Constitution."
Saner asserts that the pipeline is not available for public use because there are "strict requirements [that] tend to exclude the public from use" and "[t]he minimum use requirement on this pipeline is a 50,000 barrel shipment."

BridgeTex asserts that Saner's definition of "public use" conflicts with settled law. We agree. In *Housing Authority of City of Dallas v. Higginbotham*, the Texas Supreme Court addressed the constitutionality of condemning land for government-funded low-income housing. 143 S.W.2d 79, 84 (Tex. 1940). The appellant in *Higginbotham* challenged the taking because the housing would not be available to the public generally but only to persons of low income. *Id.* at 84. The court held that "[t]he question of whether or not in a given case the use is a public one depends upon the character and not the extent of such use." *Id.* The court further stated that:

> It is immaterial if the use is limited to the citizens of a local neighborhood, or that the number of citizens likely to avail themselves of it is inconsiderable, so long as it is open to all who choose to avail themselves of it. The mere fact that the advantage of the use inures to a particular individual or enterprise, or group thereof, will not deprive it of its public character.

*Id.* More recently, the Texas Supreme Court held that a taking of property in downtown Austin by eminent domain for a "chilled water loop" was constitutional when:

> [T]he chilled water service is available to any customer that applies, though pricing for the service is determined by the cost of connecting the customer to the chilled water loop. While district cooling may be limited in its geographic scope, it is available to all who apply and agree on pricing with the City. We hold that the district plant here was serving a public use.

*City of Austin v. Whittington*, 384 S.W.3d 766, 784–85 (Tex. 2012).

In the case before us, Saner does not deny that, per Federal Energy Regulatory Commission requirements, 10% of the pipeline's capacity will be reserved for

7

"walk-up" spot shippers, but takes issue with the apparent 50,000 barrel minimum shipping requirement. In addressing the constitutional requirement of "public use," we do not find any meaningful way to distinguish the 50,000 barrel minimum shipping requirement from the low-income requirement in *Higginbotham* or the costs imposed in *City of Austin*. Accordingly, we conclude that the pipeline's 50,000 barrel minimum shipping requirement does not violate the "public use" requirement of the Texas constitution. But our inquiry does not end here.

Saner also asserts that, "[e]ven if two or five, or a hundred crude oil producers join together using a private pipeline to maximize their profits, this still does not constitute '**public use**' as contemplated by the Texas Constitution" because "[c]rude oil producers are not the public under the Texas Constitution." He further claims that "it is not the case that by virtue of (either claimed or proven) common carrier status it can be assumed that the '**public use**' requirements of the Texas Constitution have been met." We do not find Saner's interpretation persuasive.

The evidence offered at trial supported the trial court's findings that a reasonable probability exists that the pipeline will at some point after construction serve the public by transporting crude petroleum for one or more customers who will either retain ownership or sell it to parties other than BridgeTex. Accordingly, the trial court did not err when it determined that the pipeline built across Saner's property was for "public use" as required by Article I, Section 17 of the Texas constitution. We overrule Saner's sole issue.

*This Court's Ruling*

We affirm the judgment of the trial court.


July 21, 2016                                                    JOHN M. BAILEY

Panel consists of: Wright, C.J.,                                JUSTICE
Willson, J., and Bailey, J.

8