# Supreme Court of Texas

No. 20-0393

James Fredrick Miles,

*Petitioner*,

v.

Texas Central Railroad & Infrastructure, Inc. and
Integrated Texas Logistics, Inc.,

*Respondents*

On Petition for Review from the
Court of Appeals for the Thirteenth District of Texas

JUSTICE YOUNG, concurring.

Eminent-domain power has repeatedly been called one of the most "awesome" powers of government.[1] "Scary" is another fitting term. The very words *eminent domain* and *condemnation* sound foreboding, and they should. They represent the sovereign's power to unilaterally strip individuals of property rights—rights that may have been gained at great cost. Condemnation is an extraordinary intrusion that often

---

[1] *See, e.g., State by Comm'r of Transp. v. Elbert*, 942 N.W.2d 182, 188 (Minn. 2020); *Township of West Orange v. 769 Assocs., LLC*, 969 A.2d 1080, 1085 (N.J. 2009).

destroys homes, scars farmland that generations have cultivated, disrupts thriving businesses, and far more. It is an act of force by the government that uneasily coexists with the strong protection of individual property rights that Texas law guarantees. We have described "the fundamental right of property" as being "among the most important [rights] in Texas law." *S.C. v. M.B.*, ___ S.W.3d ___, 2022 WL 2192167, at *15 (Tex. June 17, 2022).[2]

On occasion, to serve a public purpose, a citizen's private property must be taken without his consent. We tolerate such intrusions because society cannot function without roads, schools, military facilities, and other vital infrastructure. Eminent domain also requires "just" or "adequate" compensation, to be sure. U.S. Const. amend. V; Tex. Const. art. I, § 17(a). But the condemnation process is complicated, time-consuming, and sometimes confusing.[3] And *no* compensation can

---

[2] As Justice Devine's eloquent dissent puts it—and I agree—"[t]his Court has long recognized that strong judicial protection of individual property rights is essential to freedom itself." *Post* at 2 (Devine, J., dissenting); *accord post* at 4 (Huddle, J., dissenting).

[3] Chapter 21 of the Property Code is devoted to the complexities of eminent-domain practice. The condemnation process may take years, and a Texas property owner generally has no right to seek attorney's fees or compensation for her time. Just one example of the various intricacies that can entrap an unwary property owner is how Texas law resolves disagreements about the property's value. If the condemnor and the property owner cannot reach an agreement, the condemnor sues the property owner. *Id.* § 21.012. The property owner must affirmatively *defend* her right to compensation. She waives her right to have a judge (or jury) determine the amount of compensation if she does not quickly file specific objections to the results of an administrative process. *Id.* § 21.018; *see also, e.g.*, *John v. State*, 826 S.W.2d 138, 141 n.5 (Tex. 1992) (noting that, unless objections are timely filed, the court may only perform the ministerial function of rendering judgment on the administrative process's property valuation).

accurately value the sweat, tears, pride, love, beauty, and history that, for some property at least, is its chief value. A given exercise of eminent domain may turn out to be all for nothing, too. Grand plans can fail. Property may therefore be permanently damaged without purpose.[4]

These circumstances help explain why our law directs Texas courts to carefully scrutinize any exercise of eminent-domain authority. Condemnation is one area in which the government must turn sharp corners. It is a fit role for the judiciary to ensure that the government stays in its lane.

How much harder it is, then, when a *private* entity is the one wielding the power of eminent domain—without direct governmental oversight or the backing of the public fisc. Such a situation can only heighten the need for judicial vigilance. On these points I readily agree with my dissenting colleagues. *See, e.g.*, *post* at 3–5, 12 (Huddle, J., dissenting); *post* at 6 & n.13 (Devine, J., dissenting). I see nothing in the Court's opinion that disagrees, either. The law remains the same: If there is any "doubt as to the scope of the power, the statute granting such power is strictly construed in favor of the landowner and against those corporations . . . vested therewith." *Tex. Rice Land Partners, Ltd.*

---

[4] For example, in June 2020, the U.S. Supreme Court decided a permit dispute for a pipeline project in favor of a pipeline company delegated eminent-domain power by Congress. *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1841 (2020). A few weeks later, the pipeline company canceled its project. *Niskanen Ctr. v. FERC*, 20 F.4th 787, 793 (D.C. Cir. 2021) (Randolph, J., concurring). But the pipeline company had already taken easements across some properties and had begun clearing land for its pipeline. *See Atl. Coast Pipeline, LLC v. 5.63 Acres, More or Less, in Buckingham County, Va.*, No. 3:18-CV-6, 2018 WL 1097051, at *11, *17 (W.D. Va. Feb. 28, 2018) (granting the pipeline company immediate possession so it could begin cutting trees).

*v. Denbury Green Pipeline–Tex., LLC*, 363 S.W.3d 192, 198 (Tex. 2012) (quotation omitted).

Consequently, the courts *should* cast a jaundiced eye on any exercise of eminent-domain authority, especially when a private entity wants to seize another citizen's property. The charge that "the Court today abandons these longstanding principles," *post* at 3 (Huddle, J., dissenting), gets it entirely backward. This case has received the exacting level of scrutiny that our cases demand. Both the lower courts and this Court have invested untold hours to this litigation. Today's decision does not dispense with heightened scrutiny or strict compliance with the law. Today's decision is an *implementation* of those principles.

Not only has the Court remained true to those principles, it has applied them correctly. The methodological question here is of great importance. Every member of this Court agrees that doubts must be construed in the landowner's favor. But the kind of "doubt" that counts is the kind that arises from legal text, not from gut instincts or guesses.

In other words, it is not remotely enough for us to "doubt" that the legislature, if starting from scratch, *would* authorize a particular taking. It is not enough to speculate about "what the Legislature actually envisioned," *post* at 9 (Huddle, J., dissenting), and assume that the *real* statute maps on to some "envisioned" use of it rather than what its text clearly says. Reverse-engineering a statute to figure out what was "envisioned," *id.*, or what might have been the "intention of the statute," *id.* at 5, would lead only to the bad old days, when courts proclaimed what the legislative purpose was and then made the text obey. Rarely has a judge using such a methodology reached a result that the judge dislikes.

4

Likewise, I wholeheartedly share the view that "the meaning of a statute that governs is the ordinary meaning commonly understood at the time of enactment." *Id.* at 11 (quotation omitted). Indeed, that is the only thing that an enactment *can* mean—its meaning *cannot* change merely with the passage of time. Take this case, for example. If high-speed rail had existed and was well known when the legislature passed the statutes that grant eminent-domain authority here, and if it was clear that reasonable speakers of English at the time thought that those statutes did not cover high-speed rail, we would certainly conclude that those statutes do not cover high-speed rail today, either. But when a statute defines its scope by using clear words that prescribe specific conditions, such a law reaches new developments that satisfy the specified statutory criteria. *See ante* at 18. An important part of the promise of the rule of law itself extends to those who arrange their affairs in compliance with what the law requires or authorizes. If the legislature wants to cabin its statutes to existing conditions or to exclude anything that has not yet been invented, it has many tools to do so. Definition sections, sunset provisions, and other textual limitations can bound a statute's scope. The legislature can repeal or amend the statute. But when it deploys none of those tools, as with these statutes, courts cannot enter the legislative arena and do so themselves.

I say all this to emphasize the fundamental point before us: that we can judicially invalidate an exercise of condemnation only upon the kind of "doubt" about the scope or meaning of statutory or constitutional provisions that is *textually demonstrable*. Even when we would much rather the result be different, and even when we persuade ourselves that

5

the legislature *must* have intended otherwise, "we are bound" by "the words of the statute" and cannot "rewrite those words to achieve an unstated purpose." *See BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86–87 (Tex. 2017) (quotation omitted). *Cf. Hegar v. Health Care Serv. Corp.*, ___S.W.3d ___, 2022 WL 2183069 (Tex. June 17, 2022) (Blacklock, J., dissenting) (emphasizing that when the *words* of a statute deprive us of "confidence one way or the other" about the statute's meaning, clear-statement rules may supply a tie-breaker).

Given what can qualify as a judicially cognizable "doubt" in the first place, there is no reasonable doubt about any relevant text before us today. It is one thing to agree, as I do and we all do, that textual doubt about the authorization of eminent domain must be resolved against the exercise of that power. It is quite another thing to expand the terrain from the reasonable scope of statutory language all the way to the edge of what is barely conceivable. That sort of hunt for doubt will never miss its prey. We can *always* create some doubt about whether the legislature, if asked today about a particular use of eminent domain, would approve it.

One basis for supposed doubt today is that the intrusion into private-property interests that is required to build the project at issue here is massive. It certainly is. But while that feature may focus our attention or lead us to exercise special care (which we have done), the size of the intrusion cannot affect the legal analysis itself. The judiciary cannot green-light a *tiny* violation of a Texan's rights, but neither can it impede a *huge* intrusion if it is one that the law permits. For the courts, at least, the question truly does reduce to determining what the words

6

of the Texas Constitution and statutes actually mean.

On that score, I cannot regard this case as particularly close. The Texas Constitution *expressly* authorizes the use of eminent domain by private entities. Tex. Const. art. I, § 17(a)(1). Many Texas statutes *expressly* extend that power to private entities, and two such statutes apply to the Texas Central Entities. Tex. Transp. Code §§ 81.002(2), 112.002(5), 131.011–131.012. To use the power of the judiciary to thwart the use of this authority, we must conclude that *neither* statute applies. But *both* of them do.

First, as the Court's well-written opinion articulates, the delegation of eminent-domain power to "corporation[s] chartered under the laws of this state to conduct and operate an electric railway between two municipalities in this state" includes the delegation of power to the Texas Central Entities. Tex. Transp. Code § 131.012. Those two entities, chartered under Texas law, were formed for the very purpose of operating an electric railway between two Texas municipalities. If the legislature wishes to withdraw the power that it delegated—that the Constitution *allows* it to delegate—it does not need this Court's help. Nothing about the current delegation turns on the fact that technology has evolved so that an electric railway is faster, has a greater capacity, and can travel longer distances. None of those features is relevant to the text or context of a statute that has long been part of our law. We would rewrite the statute, not resolve "doubt" about the statute, if we allowed technological improvements to displace the text.

Second, the Texas Central Entities are also "operating a railroad" under Transportation Code § 81.002, as the Chief Justice's concurrence

7

explains. Any doubt that the legislature intended to restrict eminent-domain power to only entities *currently* operating a railroad is wiped away because the legislature elsewhere clarified that a railroad company "may acquire property by condemnation" for "the incorporation of the railroad," to obtain "the right of way, or new or additional right-of-way," or for "*any other purpose* connected with or necessary to the building, operating, or running of the railroad." Tex. Transp. Code § 112.053 (emphasis added). This language reveals that the legislature intended to grant nascent railroad entities, including those not yet operating trains on tracks, the power to condemn property so they might acquire "*the* right of way" and "*build*[] . . . the railroad." *Id.* (emphases added). I respect my dissenting colleagues' understanding of the text and fully credit that what divides us is only our different good-faith efforts to read it. But I find it implausible and countertextual that the Texas Legislature would gladly welcome an existing railroad company chartered in China or Chile to come and seize the property of Texas citizens to build a new railroad but would forbid a new *Texas* company from doing so. I cannot see the logic or textual command to support that result and I thus cannot join my dissenting colleagues. The legislature, I suppose, could limit eminent-domain delegations to entities that are expanding existing railroad operations in Texas or expanding from some other locale to Texas, but it has not done so.

\* \* \*

As a result, the Court today keeps the promise that every judicial system must make if it wants to remain *judicial*: "to have neither FORCE nor WILL, but merely judgment . . . ." *The Federalist No. 78*, at

490 (Alexander Hamilton) (Benjamin Fletcher Wright ed., 1961). That thought likely is cold comfort to those who have fought to protect their property. I acknowledge that reaction; I respect it; I share in the frustration that must accompany it. But without devaluing the affected property interests in the slightest, I am convinced that today's decision reflects something of great value even to those who face great loss: the judiciary's commitment to the rule of law and to the self-government of the People of Texas.

*The People* have authorized the eminent-domain authority at issue here both through the Constitution itself and through the statutes enacted by their elected representatives. If that authority should be further restricted—and maybe it should—that choice is up to the People, too. As judges, we have no authority to go beyond clearly saying what the law is. Statutes that satisfy the Constitution—and no constitutional challenge was even brought here—are not for us to "fix." Judicially circumscribing eminent-domain authority of the sort at issue here would be a well-intended but ultimately dangerous intrusion into the system of self-government that we value so highly.

It is when the stakes are high that the lines of separation between the branches matter most. The stakes here clearly are high. The parties' briefs, and the briefs and letters from amici that we have received, all agree on that point. Many speak with eloquence and urgency to the serious and even fearsome risks of eminent domain. But even more alarming is the prospect of the judiciary exceeding its role, even when— perhaps *especially* when—the issue presented is of great importance. I wholly agree that we must view with suspicion any claim of authority to

9

wield eminent-domain power, and I will always subject such a claim to exacting scrutiny. Reversing the judgment below, however, would require something more: a textual basis to doubt the scope of the statutes at issue here. I see no good basis for disregarding the plain text. I therefore join both the Court's opinion and the Chief Justice's concurrence.

Evan A. Young
Justice

**OPINION FILED:** June 24, 2022

10