# IN THE SUPREME COURT OF TEXAS

══════════

No. 19-0689

══════════

KATHLEEN POWELL & PAUL LUCCIA, PETITIONERS,

v.

CITY OF HOUSTON, TEXAS, RESPONDENT

══════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS
══════════════════════════════

JUSTICE BLAND, joined by JUSTICE DEVINE, JUSTICE BLACKLOCK and JUSTICE HUDDLE, concurring.

The City of Houston offers a litany of reasons that its historic preservation ordinance is not zoning but is something else entirely. Why? Because the City cannot zone. Its Charter expressly forbids it.

Some voters favor robust private property rights while others favor stricter land-use regulation. And a voter may think differently about a zoning restriction depending on whose land it regulates and how. This debate plays out in representative forums—city councils and state legislatures—resulting sometimes in land-use restrictions and sometimes in land-use protections. The Court takes no side in the debate other than to enforce the United States and Texas Constitutions and laws as written.

In enforcing those laws, however, we must consistently apply land-use terminology so that one side cannot evade existing protections by redefining what is protected. Legal protections afforded to private property ownership lose their value if a governing body evades them merely by recharacterizing a zoning ordinance as "not" zoning.

The City's Historic Preservation Ordinance stands perilously close to the line of traditional zoning. I agree with the Court that the Ordinance stops short of zoning under the common-law definition because the restrictions it imposes within its regulated districts are not uniform—they vary from house to house, street to street, and district to district. The Ordinance also does not have the geographic reach of traditional zoning—it does not partition the City. Either would place the Ordinance on the other side of the line.

In concluding that the City's Ordinance is not traditional zoning, however, the Court reaches beyond these two considerations.[1] It examines the Ordinance's historic-preservation goals and ignores the implications of the City's Charter in suggesting that the City may create uniform historic-preservation districts.[2] We instead should evaluate the Ordinance's text to determine whether it meets the definition of zoning according to its ordinary meaning when the City's voters chose not to permit it absent a referendum.

I further disagree with the Court's conclusion that the Ordinance is not a land-use regulation.[3] One predominant use of land is to develop it and affix structures to it. The Ordinance

---

[1] *See ante* at 16–19.

[2] *Ante* at 18–19; *see ante* at 6, 12–14.

[3] *See ante* at 16 ("Significantly, the Ordinance does not regulate the purposes for which land can be used.").

2

plainly restricts development, as well as the alteration, rehabilitation, and restoration of existing structures within historic districts, and the relocation of any structure within, into, or out of them. The Court holds that an ordinance must expressly regulate an activity other than property development to qualify as zoning. But limits on construction and development are strong indicia of zoning.

Because we should not so narrow the traditional definition of "zoning" as to deprive it of its ordinary meaning, and the Court does, I respectfully concur.

## I

Houston voters have consistently rejected efforts to establish zoning in the City, to both acclaim and criticism. One commentator summarizes the City's unique history and approach to land-use regulation:

> In November 1993 voters in Houston narrowly rejected a referendum to establish zoning in that city. This was the third time in a half-century that Houston voters had rejected zoning. Thus Houston remains the only major city in the United States without zoning. To zoning's supporters, Houston represents an unenlightened backwater that has stubbornly resisted the tide of twentieth century land use regulation. To zoning's critics, Houston stands as a lonely beacon of economic rationality, or at least a living laboratory in which alternatives to zoning can be fairly tested.[4]

---

[4] Bradley C. Karkkainen, *Zoning: A Reply to the Critics*, 10 J. LAND USE & ENV'T L. 45, 45 (1994) (citations omitted); *see also* Bernard H. Siegan, *Non-Zoning in Houston*, 13 J. L. & ECON. 71, 75 (1970) (observing that, "[a]lthough Houston has no zoning ordinance, it has adopted some controls over land uses that are ordinarily found in zoning ordinances," and noting land-use controls are "extremely modest when compared to what is contained in most zoning ordinances"); Bernard H. Siegan, *Conserving and Developing the Land*, 27 SAN DIEGO L. REV. 279, 295–305 (1990) (suggesting that commingling of land uses in Houston is "more than offset by the economic and social rewards emanating from the absence of unnecessary government restraints over the development of property"). Instead of a comprehensive zoning plan, the City relies on deed and plat restrictions and other non-comprehensive land-use regulations. *See* TEX. LOC. GOV'T CODE §§ 211.001–.033 (setting forth limits on municipal land-use regulations, including those for historic preservation).

After the City's residents voted to reject zoning, the City amended its Charter to forbid it unless the City's voters permit it by referendum:

> The City of Houston shall have the power to adopt a zoning ordinance only by: (a) allowing a six month waiting period after publication of any proposed ordinance for public hearings and debate and (b) holding a binding referendum at a regularly scheduled election.[5]

After the voters revoked the City's authorization to zone, the Houston City Council adopted its Historic Preservation Ordinance, providing "for the recognition, protection, enhancement, perpetuation and use of sites, landmarks and areas of historical or archeological interest within the City." The Ordinance establishes a process for the creation of historic districts.[6] Once created, a landowner must apply to the Houston Archaeological and Historical Commission for a "certificate of appropriateness" to demolish, modify, relocate, or develop property situated within the district.[7]

In its original form, the Ordinance was essentially advisory. After applying for a certificate of appropriateness, the Ordinance subjected landowners in historic districts to a ninety-day waiting period to allow a planning director to review a landowner's proposed project. Once the ninety-day period passed, however, the landowner was automatically entitled to a "waiver certificate," which allowed the owner to proceed with development plans without Commission approval.

In June 2010, however, the City Council placed a moratorium on these waiver certificates. The Council then amended the Ordinance to eliminate the waiver altogether. The Council also established more restrictive guidelines for the construction or alteration of structures within

---

[5] HOUSTON, TEX., CHARTER, art. VII-b, § 13 (added by amendment on January 15, 1994).

[6] HOUSTON, TEX., CODE OF ORDINANCES, ch. 33, art. VII, § 33-225 (2021); *see id.* §§ 33-221, 33-221.1.

[7] *See id.* §§ 33-236, 33-239.

4

historic districts. Now, with limited exemptions,[8] a landowner cannot demolish or modify an existing structure or otherwise develop property situated within a historic district absent a certificate.[9] The amended Ordinance also tethers the certificate to a landowner's adherence to style and aesthetic guidelines,[10] and height, size, and location restrictions.[11] These restrictions will vary, depending on the look and size of nearby existing structures.

Despite these significant development restrictions, the Ordinance posits: "Nothing in this article shall be construed to authorize the city to regulate the use of any building, structure or property."[12]

## II

The Court holds that the Ordinance is not "zoning" in its traditional sense. In doing so, the Court views historic preservation differently from other kinds of zoning. The Court further accepts the Ordinance's characterization as not "regulat[ing] the use of any . . . property" at face value, despite every provision that follows establishing the opposite.

The Ordinance's historic-preservation purpose should not inform our inquiry, which is simply to determine the ordinary meaning of "zoning." Any definition of zoning should not replace the commonly understood meaning that voters had when they withdrew the City Council's

---

[8] *Id.* § 33-237.

[9] *Id.* § 33-236.

[10] *See id.* §§ 33-240, 33-241, 33-242.

[11] *See id.* §§ 33-241.1, 33-242.

[12] *Id.* § 33-202(b).

authority to zone.[13] And we should reject any characterization that land-use restrictions as far-reaching as these do not regulate the "use" of property within historic districts.

Ultimately leaving these considerations aside, the Court concludes that zoning is "the district-based regulation of the uses to which land can be put and of the height, bulk, and placement of buildings on land, with the regulations being uniform within each district and implementing a comprehensive plan."[14] On that much, we agree.

## A

The Court does not limit its discussion to that definition, however. Seizing upon a distinction the United States Supreme Court advanced in *Penn Central Transportation Co. v. City of New York*,[15] the Court suggests that we must not view historic-preservation regulation as zoning.[16] The Court reads *Penn Central* and its discussion of the historic-preservation movement as creating a separate category, subject to less vigorous review than traditional zoning, because historic-preservation regulation promotes laudable goals.[17]

---

[13] *See Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (holding that it is a fundamental canon of statutory construction that words generally should be interpreted as their ordinary, contemporary, common meaning at the time the statute was enacted); *see also Hous. Belt & Terminal Ry. Co. v. City of Hous.*, 487 S.W.3d 154, 164 (Tex. 2016) ("We apply rules of statutory construction to construe municipal ordinances."). Such a definition also should not supplant the restraints placed on the City's authority to engage in historic preservation under its home-rule police powers. *See* TEX. LOC. GOV'T CODE §§ 211.001–.033.

[14] *Ante* at 16.

[15] 438 U.S. 104 (1978).

[16] *See ante* at 12–13.

[17] *See ante* at 12–14; *see also Penn Cent.*, 438 U.S. at 108 (explaining that the movement was precipitated by a "widely shared belief that structures with special historic, cultural, or architectural significance enhance the quality of life for all," and describing historic-preservation efforts as "but one aspect of the much larger problem . . . of enhancing . . . the quality of life for people" (quoting Frank B. Gilbert, *Precedents for the Future*, 36 L. & CONTEMP. PROB., 311, 312 (1971))).

Preservation of historic structures *is* a laudable goal that has saved many of this nation's oldest and most architecturally significant neighborhoods. Many landowners voluntarily ascribe to this ideal, and for many years the City encouraged voluntary historic preservation.

The problem in this case is that the City's Charter bans zoning absent voter approval in a regularly scheduled City election.[18] Relying on *Penn Central* to support the Ordinance is questionable, given that Texas affords more expansive statutory protections for private property rights than the federal Fifth Amendment.[19] And, in particular, the City's Charter makes no exception for historic preservation.

We should not create one by excepting historic-preservation districts from the traditional definition of zoning. The common-law understanding of zoning does not exclude land-use divisions intended to achieve certain goals, however laudable, nor excuse them from protections afforded to private property development. As the Court recites, dictionaries and caselaw confirm that zoning is defined primarily through its effect—division, partition—not the intent motivating it.[20]

---

[18] HOUSTON, TEX., CHARTER, art. VII-b, § 13 (added by amendment on January 15, 1994).

[19] *Compare Penn Cent.*, 438 U.S. at 128–31, 135–38 (holding that New York historic-preservation regulation passed in accord with state law was not a taking under the Fifth Amendment because it did not interfere with present land uses and allowed for a "reasonable return" on property owner's investment), *with Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline–Tex., LLC*, 363 S.W.3d 192, 204 (Tex. 2012) (observing that "fundamentally, freedom itself . . . demand[s] strong protections for individual property rights" and noting that, "[w]hile neighboring states impose fewer restrictions" in the takings context, "the Texas Legislature enacted a regime more protective of landowners"); *see also* TEX. GOV'T CODE §§ 2007.001–.045. (establishing the Private Real Property Rights Preservation Act); TEX. LOC. GOV'T CODE §§ 211.001–.033 (setting forth limits on municipal land-use regulations, including those for historic preservation). As the Court ultimately acknowledges, the effect of a regulation—and not its purpose—informs whether the regulation amounts to zoning. *Ante* at 14 ("[H]istoric-preservation ordinances . . . can amount to zoning if they share the common features of zoning we identify today.").

[20] *Ante* at 7–12.

Black's Law Dictionary describes zoning as the "legislative division of a region, esp. a municipality, into separate districts with different regulations within the districts for land use, building size, and the like," and Merriam-Webster likewise defines zoning as "the act or process of partitioning a city, town, or borough into zones reserved for different purposes (such as residence or business)."[21] Neither definition suggests that zoning is limited to restrictions aimed at achieving certain goals but not others. The definitions focus on the regulatory effect: "division" and "partition."

The Court observes that Black's Law Dictionary lists no historic-preservation subcategory, suggesting again that the goal of historic preservation excepts it from "traditional" zoning. Opposed to that reading, however, is that Black's recognizes both "aesthetic zoning," which is zoning "designed to preserve the aesthetic features or values of an area," and "contextual zoning," which is an "approach to zoning that considers appropriate use of a lot based on the scale and types of nearby buildings"—precisely the effect of the City's Ordinance.[22]

The City's residents voted to protect private property owners against centrally planned, government-imposed zoning—that is, they voted to prohibit the comprehensive division of the City into districts with uniform restrictions, absent voter approval. The City's Charter is agnostic to the purposes—however laudable—motivating the zoning. We should be too.

---

[21] *Zoning*, BLACK'S LAW DICTIONARY (11th ed. 2019); *Zoning*, MERRIAM-WEBSTER ONLINE (2021).

[22] *Aesthetic zoning*, BLACK'S LAW DICTIONARY (11th ed. 2019) (sub-definition of "zoning"); *Contextual zoning*, *id.* (same).

## B

The City also invokes the process related to the Ordinance's adoption and amendment in an attempt to excuse it from the City Charter's ban on traditional zoning absent a city-wide referendum. Though this process may bear on whether the City may enforce the Ordinance, it does not indicate whether it constitutes zoning.

As the landowners in this case observe, the Ordinance's creation of historic districts is less democratic than the City suggests. Although the Ordinance has always required a majority of owners within a proposed historic district to create it at the outset,[23] once designated, landowners had no say on future amendments—in particular, the change from voluntary to mandatory compliance.[24]

This imbalance was on display in 2010 when the City Council eliminated the waiver-certificate program. In its original form—under which the City created most of its historic districts—the Ordinance had no enforcement mechanism and landowners seeking to develop their land required no historic-preservation approval. Ninety days after applying for a certificate of appropriateness, a landowner was free to proceed.[25] The City replaced this voluntary program with a mandatory one—after these owners purchased their land, without a vote.

---

[23] *See* HOUSTON, TEX., CODE OF ORDINANCES, ch. 33, art. VII, § 33-222.1(f) (2021).

[24] For example, in the summer of 2010, the City held public meetings at various locations to receive historic district residents' comments on the proposed amendments to the Ordinance. On August 10, the City held a meeting for the three Heights Historic Districts, at which approximately 62% of the property owners in attendance voted against the 2010 amendment.

[25] In 2005, the Ordinance was amended to increase historic-landmark protections. The 2005 amendment prohibited waiver certificates for buildings that were (1) built before 1905, (2) listed in the National Register of Historic Places, and (3) recognized by the State as a historic landmark. This amendment affected a very small percentage of properties located within historic districts.

The Ordinance lacks a democratic mechanism to repeal the historic-district designation should the City Council impose further restrictions on owners' property rights. Although the City Council implemented a one-time "process for reconsideration"—available only in 2010—that process was hardly democratic. In the end, the City Council possesses the exclusive authority to decide whether to repeal a historic-district designation.[26]

What followed when Heights East residents moved for reconsideration in 2010 illustrates this point. The City mailed each property owner a "survey" to gauge support for repealing the historic-district designation. Of the 780 property owners, 193 desired to repeal the historic-district designation; the record does not reflect whether the 587 remaining property owners expressed any preference at all. Even had all owners desired to repeal the designation, the City Council was free to disregard the vote, as it had ignored the majority of property owners in the Heights Historic Districts who opposed the Ordinance's 2010 amendment in the first place.[27]

For these reasons, neither the Court nor the City contends that the Ordinance's ever-changing repeal process complies with the Charter's referendum requirement that would permit the City to zone. The City seeks to avoid the true "democratic process" in this case: the referendum

---

[26] To trigger the reconsideration process, more than 10% of property owners within a historic district were required to join in a request to the director of the City's Planning and Development Department, at which point the director considered the request in light of several factors, such as the original criteria for designation of the historic district, any changed circumstances identified in the request for reconsideration, and the current level of support for the designation of the historic district. Homeowners' support for continued designation was ostensibly measured by the same mail-in voting process used to create historic districts—each tract owner would receive one vote. If more than 51% of the district's property owners indicated they did not support continued designation, the director would recommend that the City Council repeal the resolution creating the historic district. The City Council was not bound by the director's recommendation, however, and its vote on the matter was final.

[27] *See supra* note 24.

that resulted in the City Charter forbidding zoning. Unless and until a city-wide referendum permits it, the City may not zone.

C

Ordinances that regulate building placement or whether a landowner can build at all are as much land-use restrictions as ordinances regulating activities (e.g., residential, commercial, industrial uses). Not all land-use regulation of construction and development is zoning. Deed restrictions, for example, limit land use but are not dictated by top-down central planning that partitions the city. The Ordinance does not transform itself into something other than zoning, however, merely because it regulates land development and no other activities.

The Court sweeps too widely in stating that restrictions on the appearance and location of buildings do not restrict "uses of land." The government effectively may restrict nearly any activity by restricting the structure necessary to house it—its size, density, set-back, and architectural requirements. Regulating the owner's ability to develop the land limits the types of uses to which that land can be put. The Court's understanding of land use is at odds with the common law and strays from the task at hand of ascertaining the intent of Houston voters who chose to limit zoning in 1993.[28] As the Court acknowledges, "site regulations" are a feature "common to zoning ordinances."[29] We thus should conclude that the voters considered centrally planned "site regulations" as a restriction they sought to limit when they rejected centrally planned zoning.

---

[28] The Court posits that "site regulations . . . do not directly regulate use of land as the concept is understood in the zoning context," but cites zoning ordinances that do exactly that. *Ante* at 17.

[29] *Ante* at 17.

Returning to Black's Law Dictionary, a "land-use regulation" is an "ordinance . . . governing the development or use of real estate."[30] Quoting a treatise, Black's tells the reader that regulation of use includes not just "the type of use, such as whether it will be used for agricultural, commercial, industrial, or residential purposes," but also "the density of use," "the aesthetic impact of the use," and "the effect of the particular use of the land on the cultural and social values of the community."[31] Examples abound in this Court's jurisprudence equating density and aesthetic land-use regulations to "zoning." In *Mayhew v. Town of Sunnyvale*, for example, we characterized minimum-density restrictions as "zoning."[32] In *City of Dallas v. TCI West End*, we characterized a historic-district ordinance as a "zoning ordinance" colloquially and as "zoning that provides for the use of land" for the purposes of section 54.012(3) of the Local Government Code.[33]

More practically, the landowner with a passion for modern architecture or a style that does not match the neighborhood experiences the Ordinance as a restriction of the owner's desired use of the property as much as an Ordinance that forbids commercial activity. If the owner's desired use is incompatible with an existing historic building, then the owner cannot use the land in the manner the owner intends.

The Ordinance attempts to disguise its land-use restrictions by disclaiming that it is not regulating "the use of any building, structure or property" but merely the *appearance* and

---

[30] *Land-use regulation*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[31] *Id.* (quoting Peter W. Salsich Jr., LAND USE REGULATION 1 (1991)).

[32] 964 S.W.2d 922, 925–26, 937–38 (Tex. 1998).

[33] 463 S.W.3d 53, 54–55 (Tex. 2015) (per curiam).

*maintenance* of the same.[34] It is disingenuous, however, to claim that a landowner's desired use of a property is unrelated to its appearance. Of course, the Ordinance does more than regulate a property's appearance and maintenance: it requires Commission approval of any request to develop the property, to remodel, or to remove an existing structure.

The Ordinance's saving grace is that it does not impose standardized regulations and has no comprehensive effect across the City—it applies to less than one percent of the City's total lots. If that were not the case, no underlying or stated intent would absolve it from meeting the common-law definition of zoning.[35] If the City were to amend the Ordinance to provide for more uniform application within historic districts, or to partition the City overall, the conclusion as to whether this Ordinance meets the common-law definition of zoning would be different.[36]

### D

The Court correctly concludes that the City's authority to engage in historic preservation under its home-rule police powers is constrained by state land-use laws.[37] The Court also holds, and I agree, that the Ordinance qualifies as zoning under the Local Government Code.[38] The Code

---

[34] HOUSTON, TEX., CODE OF ORDINANCES, ch. 33, art. VII, § 33-202(b) (2021); *see id.* §§ 33-241, 33-242, 33-244.

[35] The Ordinance's disclaimer that it does not impose any land-use restrictions is meaningless if it, in fact, imposes land-use restrictions. *See id.* § 33-202(b) ("Nothing in this article shall be construed to authorize the city to regulate the use of any building, structure or property.").

[36] The individualized application of the Ordinance, depending on a property's particular location within the district, could present enforcement problems due to its arbitrariness. *See* TEX. LOC. GOV'T CODE § 211.005(b) (for purposes of the City's Code, "[z]oning regulations must be uniform for each class or kind of building in a district, but the regulations may vary from district to district").

[37] *Ante* at 28, 30; *see Spann v. City of Dall.*, 235 S.W. 513, 515 (Tex. 1921) (holding that the police power is subject to the limitations of the Constitution, including the protection of private property).

[38] *Ante* at 33.

13

defines zoning more broadly than the traditional common-law definition in that it expressly includes "spot" or partial zoning, particularly for historic-preservation purposes. In other words, the statute does not require city-wide division or partition but instead applies to "areas of historical, cultural, or architectural importance and significance" in "designated places and areas."[39] As a result, Chapter 211 provides statutory checks on the City's Ordinance.

*    *    *

As the Court holds, the Ordinance does not meet the traditional common-law definition of zoning because it is neither geographically comprehensive nor uniformly applied within the geographic areas it regulates. We should not consider, however, the historic-preservation purpose of the Ordinance, the process to adopt it, nor its confinement to property development as other reasons to exclude it from that definition. The Court's broader reasoning may provoke the City to false confidence in its ability to evade private property protections by mischaracterizing the substance of its land-use regulations. Because the traditional definition of zoning affords more latitude than the Court does, and thus more consideration of private property protections in the

---

[39] TEX. LOC. GOV'T CODE § 211.003(b); *see id.* § 211.005.

14

City's Charter designed to balance the scales in the land-use regulation debate, I respectfully concur.

_____

Jane N. Bland
Justice

OPINION DELIVERED:  June 4, 2021