In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-12-00563-CV
_____

CROSSTEX NGL PIPELINE, L.P., Appellant

V.

REINS ROAD FARMS-1, LTD., Appellee

On Appeal from the 60th District Court
Jefferson County, Texas
Trial Cause No. D-192,430

OPINION

In this interlocutory appeal,[1] Crosstex NGL Pipeline, L.P. contends the trial

court was required to grant its request for an injunction to prevent Reins Road

Farms-1, Ltd. (RRF), a landowner, from interfering with its attempt to survey

RRF's property to complete its planned natural-gas-liquids pipeline. In one issue,

Crosstex contends it is entitled to prevail on its request for injunctive relief because

[1]*See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (West Supp. 2012).

1

it has a cause of action on which it will probably prevail, and it will suffer an irreparable injury if relief is not granted. RRF contends that Crosstex failed to demonstrate that it is entitled to any injunctive relief, and asserts that Crosstex does not possess the power of eminent domain for a pipeline that would neither be used to transport crude petroleum nor be used by the public.

We conclude the trial court did not abuse its discretion by determining, as a preliminary matter, that Crosstex is not likely to prevail on its claims. Therefore, we affirm the trial court's order denying Crosstex's request for temporary injunctive relief.

## Background

In 2011, Crosstex obtained a permit from the Texas Railroad Commission to operate a twelve-inch pipeline that, when built, would be used to transport natural gas liquids between Daisetta, Texas, and Crosstex's affiliated processing plants in Louisiana. A tract of property owned by RRF, which is located in Jefferson County, lies in the pipeline's proposed route. In November 2011, Crosstex's agent requested that RRF grant Crosstex permission to survey the tract. Several months later, RRF refused to permit Crosstex to enter the tract to conduct the survey.

In May 2012, Crosstex sought a declaratory judgment and a temporary injunction to prevent RRF from interfering with the right it claimed as a common

2

carrier to access and survey RRF's tract. RRF answered, denying that Crosstex could establish that it was a common carrier or that it could establish the proposed pipeline would be used by the public.

Subsequently, the trial court conducted a hearing on Crosstex's request for temporary injunctive relief. Brad Iles, the vice-president of corporate development for Crosstex Energy Services[2] was the sole witness who testified at the hearing. Several weeks later, the trial court signed an order denying Crosstex's request for temporary injunctive relief. None of the parties asked the trial court to make written findings of fact or conclusions of law.

## Standard of Review

We note our jurisdiction over Crosstex's interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (West Supp. 2012) (authorizing appellate review from orders that grant or deny requests for temporary injunctions). A party who requests temporary injunctive relief seeks equitable relief. *See* Tex. R. Civ. P. 693; *see also In re Tex. Natural Res. Conservation Comm'n*, 85 S.W.3d 201, 204 (Tex. 2002) (orig. proceeding). A temporary injunction hearing allows the trial court to determine if the applicant is entitled to "preserve the status quo of the

---

[2]According to corporate exhibits contained in the record, Crosstex Energy Services GP, LLC is the sole general partner of Crosstex NGL Pipeline, L.P.

3

litigation's subject matter pending a trial on the merits." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). "To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Id.*

In reviewing a trial court's ruling on a request that seeks temporary injunctive relief, "the merits of the underlying case are not presented for appellate review. Appellate review of an order granting or denying a temporary injunction is strictly limited to the determination of whether there has been a clear abuse of discretion by the trial court in granting or denying the interlocutory order." *Davis v. Huey*, 571 S.W.2d 859, 861-62 (Tex. 1978). An abuse of discretion occurs when a trial court acts in an unreasonable or arbitrary manner. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). "An abuse of discretion does not exist where the trial court bases its decision on conflicting evidence." *Davis*, 571 S.W.2d at 862.

In reviewing the evidence from a temporary injunction hearing, and when a trial court has not been requested to enter findings of fact or conclusions of law, we view the evidence in the light most favorable to the trial court's order and indulge every reasonable inference in its favor. *See Thomas v. Beaumont Heritage Soc'y*,

296 S.W.3d 350, 352 (Tex. App.—Beaumont 2009, no pet.). In viewing the evidence in the light most favorable to the trial court's findings, we presume all findings necessary to support the trial court's judgment, and we affirm the ruling if there are pleadings and evidence that support it. *See id.*; *Davis*, 571 S.W.2d at 862. Nevertheless, trial court rulings regarding requests for temporary injunctive relief are preliminary decisions: they are not final decisions that finally resolve any disputed facts. *See Butnaru*, 84 S.W.3d at 204.

Analysis

First, we evaluate Crosstex's claim that the evidence established that its pipeline is a crude petroleum line. According to Crosstex, common carrier lines are used to transport crude petroleum, crude petroleum includes natural gas liquids, and crude petroleum lines are given common carrier status by section 111.002(1) of the Texas Natural Resources Code.[3] *See* Tex. Nat. Res. Code Ann. § 111.002(1) (West 2011). According to RRF, the trial court properly denied the temporary injunction because pipelines carrying natural gas liquids are not crude petroleum

_____

[3]This section provides:

A person is a common carrier subject to the provisions of this chapter if it:
    (1) owns, operates, or manages a pipeline or any part of a pipeline in the State of Texas for the transportation of crude petroleum to or for the public for hire, or engages in the business of transporting crude petroleum by pipeline[.]

5

pipelines. According to RRF, natural gas liquids are not encompassed by the common definitions that apply to the term "crude petroleum."

Resolving the parties' dispute requires that we determine whether section 111.002(1) of the Natural Resources Code includes natural-gas-liquid pipelines. *See id*. Section 111.002(1) expressly applies to pipelines used to transport "crude petroleum," a term that is not further defined in Chapter 111 of the Natural Resources Code. *See id.* §§ 111.001-.406 (West 2011 & West Supp. 2012).[4] When the meaning of a word in a statute is not ambiguous, courts ordinarily give the word its common meaning. *See Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000); *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865 (Tex. 1999). Also, in construing the Natural Resources Code, courts are to generally follow the rules of construction found in the Code Construction Act, Chapter 311 of the Government Code. *See* Tex. Nat. Res. Code Ann. § 1.002 (West 2011); Tex. Gov't Code Ann. §§ 311.001-.034 (West 2013).

---

[4] We note that the term "'[c]rude oil'" is defined for the purposes of Chapter 40 of the Natural Resources Code, the Oil Spill Prevention and Response Act of 1991, as meaning "any naturally occurring liquid hydrocarbon at atmospheric temperature and pressure coming from the earth, including condensate." Tex. Nat. Res. Code Ann. § 40.003(6) (West 2011). Nevertheless, even if we were to adopt that definition for the term "crude petroleum," the trial court did not abuse its discretion by deciding, on the record before it, that natural gas liquids were not in a liquid form when produced at the wellhead under normal conditions.

Courts construing the terms of a statute are to examine the words of a statute that are not expressly defined in context and in accord with "the rules of grammar and common usage." Tex. Gov't Code Ann. § 311.011(a). Commonly used dictionaries are used to assist a court in its task of determining a word's common use. *See generally Powell v. Stover*, 165 S.W.3d 322, 326 (Tex. 2005); *Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 196 (Tex. 2004).

As defined by Webster's Dictionary, "crude petroleum" is "petroleum as it occurs naturally, as it comes from an oil well, or after extraneous substances (as entrained water, gas, and minerals) have been removed[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 546 (2002). Additionally, Webster's defines "crude" as "a substance in its natural unprocessed state: as **a:** CRUDE OIL **b:** initial products of distillation of crude oil without cracking or other treatment[.]" *Id.*

Additionally, to determine the intended meaning of a provision in a statute, we look at the entire statute. *See Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 454 (Tex. 2012) ("Further, legislative intent emanates from the Act as a whole, and not from one isolated portion."). Other provisions of the Natural Resources Code reflect that the Legislature appreciates a distinction between substances that are in a crude state and substances that are derived as by-products from that substance.

7

For example, Chapter 115 of the Natural Resources Code provides a definition of the term "'[o]il'" as including "crude petroleum oil: (A) in its natural state as produced; or (B) from which only the basic sediment and water have been removed." Tex. Nat. Res. Code Ann. § 115.001(5) (West 2011). Also, the term "crude oil" is defined in section 40.003 of the Natural Resources Code as "any naturally occurring liquid hydrocarbon at atmospheric temperature and pressure coming from the earth, including condensate." *Id.* § 40.003(6) (West 2011). Significantly, the Natural Resources Code makes a distinction between crude petroleum oil and gasses that may be produced in conjunction with producing crude petroleum oil. *Compare* Tex. Nat. Res. Code Ann. § 86.002(1) (West 2011) (defining "'[o]il'" to mean "crude petroleum oil"), *with id.* § 86.002(10) (West 2011) (defining "'[c]asinghead gas'" to mean "any gas or vapor indigenous to an oil stratum and produced from the stratum with oil"), *and id.* § 86.002(11) (defining "'[n]atural gasoline'" to mean "gasoline manufactured from casinghead gas or from any gas"). Also, Chapter 115, which concerns the regulation of transporters of oil and petroleum products, distinguishes between the term "'[o]il[,]'" which it defines to include "crude petroleum oil[;]" and various other "'[p]etroleum product[s,]'" which are defined to include "gas oil[,]" "casinghead gasoline[,]" "natural gas gasoline[,]" "distillate[,]" as well as "any other liquid

8

petroleum product or byproduct derived from crude petroleum oil or gas." *Compare* Tex. Nat. Res. Code Ann. § 115.001(5), *with id.* § 115.001(7)(K), (L), (M), (O), (X) (West 2011). The Legislature's choice to distinguish between crude oil and by-products of crude in various other provisions found in the Natural Resources Code lends support to our conclusion that the Legislature did not conflate crude petroleum and all of its potential by-products.

The testimony from the hearing lends support to the trial court's conclusion that natural gas liquids are not the same substance as crude petroleum. Iles, the vice-president of corporate development of Crosstex Energy Services, described how natural gas liquids are extracted from a stream that began as a crude gas. According to Iles, the crude gas stream is sent to a compressor station and then to a processing plant, where it is subjected to extremely low temperatures that are well below freezing. The cold temperatures force the crude gas stream into two streams, a natural gas stream and a stream consisting of natural gas liquids.

Iles did not describe the processing required to produce natural gas liquids in very much detail; for example, the record does not reflect what portions of the natural gas liquids to be transported will come from oil wells versus the portions that will be derived from gas wells, nor did he describe whether differences existed in the processing that is required by those two crude streams. However, the meager

9

evidence from the hearing about how natural gas liquids are produced allowed the trial court to infer that natural gas liquids are extracted through a process that involves submitting a crude gas stream to temperatures far below freezing. The trial court could infer from the testimony that natural gas liquids result from a process that creates a product different from the gas stream that is captured at the wellhead under normal temperatures and pressures.

For purposes of Chapter 111 of the Natural Resources Code, the trial court's conclusion that a pipeline used to transport natural gas liquids is not the same as a pipeline used to transport crude petroleum was a reasonable conclusion based on the statute and the evidence admitted at the hearing. On this record, we hold the trial court did not clearly abuse its discretion by rejecting Crosstex's argument that the term "crude petroleum" includes a by-product like natural gas liquids.

Crosstex also argues that even if the line is not a crude petroleum pipeline, the evidence before the trial court demonstrates that it is a common carrier under section 2.105 of the Texas Business Organizations Code.[5] *See* Tex. Bus. Orgs.

---

[5] Section 2.105 of the Business Organizations Code provides:

In addition to the powers provided by the other sections of this subchapter, a corporation, general partnership, limited partnership, limited liability company, or other combination of those entities engaged as a common carrier in the pipeline business for the purpose of transporting oil, oil products, gas, carbon dioxide, salt brine,

Code Ann. § 2.105 (West 2012). According to Crosstex, it is a common carrier because the pipeline is available for public use and is subject to the authority of the Texas Railroad Commission.

Section 2.105 grants common carrier status to entities that include limited partnerships when the entity is "engaged as a common carrier" and uses its pipeline to transport "oil products[.]" *Id*. RRF does not argue that a natural-gas-liquids pipeline could never be a common carrier line; instead, it argues that the evidence from the hearing allowed the trial court to infer that the pipeline would be nothing more than a private pipeline because Crosstex would probably use it solely for the purpose of transporting its natural gas liquids to its processing plants for further processing.

The evidence before the trial court is conflicting on the question of whether the pipeline, when completed, would be operated for the public's use. According to RRF, there is evidence supporting the trial court's conclusion that the line would not be used as a common carrier line. According to Crosstex, the evidence at the hearing established, as a matter of law, that it is the owner of a line that will

> fuller's earth, sand, clay, liquefied minerals, or other mineral solutions has all the rights and powers conferred on a common carrier by Sections 111.019-111.022, Natural Resources Code.

Tex. Bus. Orgs. Code Ann. § 2.105 (West 2012).

transport crude petroleum and liquefied minerals for the public for hire, and that the proposed pipeline would be regulated by the Texas Railroad Commission.

Crosstex supports its argument with evidence from the hearing showing (1) it had received a T-4 permit from the Railroad Commission to operate the pipeline at issue; (2) it had solicited bids from unaffiliated bidders in an open season, seeking customers who would transport natural gas liquids on the proposed pipeline; and (3) it had one agreement in place with a third-party shipper authorizing that shipper, in return for paying a fee, to use the pipeline to transport natural gas liquids owned by the shipper while the product was in transit. RRF points to evidence that (1) the pipeline would be an extension of Crosstex's existing private pipeline, (2) its planned use is to transport natural gas liquids between Crosstex-affiliated entities, (3) the proposed pipeline has no posted tariff, (4) Crosstex has plans to use most or all of the pipeline's capacity for transporting natural gas liquids among its own affiliates, and (5) no other shippers can make a practical use of the proposed pipeline as currently designed to transport their own natural gas liquids.

After carefully reviewing the evidence from the hearing, we conclude there is evidence supporting the inference that the pipeline will not actually be used by the public. Although it was shown that the Railroad Commission had issued a T-4

12

permit for the line, the Texas Supreme Court recently held that a party may dispute whether a pipeline has a public use despite the issuance of a T-4 permit. *See Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline-Tex., LLC*, 363 S.W.3d 192, 198 (Tex. 2012). Although Crosstex points out that the *Texas Rice* Court's holding is limited to carbon dioxide lines, regulated by section 111.002(6) of the Natural Resources Code, we are not persuaded the Court's reasoning concerning the process of obtaining a T-4 permit applies only to carbon dioxide lines. *See id.* at 202 n.28. Assuming that courts are allowed to consider all of the relevant evidence regarding a pipeline's probable use, the record before us contains evidence supporting the trial court's inference that the public would not, in all probability, actually use Crosstex's pipeline.

Crosstex also asserts that the evidence conclusively demonstrates that the pipeline has been dedicated to the public's use. Nevertheless, a common carrier pipeline is one that serves the public; it is not one that will be used only by the builder. *See Tex. Rice*, 363 S.W.3d at 200.

Some of the evidence from the hearing tends to show that the pipeline would be used exclusively by Crosstex and its affiliates. For example, the evidence includes a Crosstex press release stating that the capacity of the pipeline would be 70,000 barrels per day. The evidence from the hearing indicates that Crosstex had a

commitment requiring that it provide Crosstex affiliates with 70,000 barrels per day of the pipelines capacity. But, at the hearing, Iles testified that the design capacity was 77,000 barrels per day. According to Iles, other shippers over time, could utilize some of the pipeline's capacity. Given the conflicting evidence, the trial court could conclude that Crosstex and its affiliated companies would be using the pipeline's entire capacity.

Crosstex also points to its efforts to obtain unaffiliated customers for the pipeline. But, there was evidence showing that those efforts were unsuccessful, with the exception of one shipper discussed subsequently. After failing to obtain transportation agreements under its initial public tariff, the evidence showed that Crosstex did not alter its proposed tariff and that it had not conducted another open season in an effort to gain unaffiliated customers for the proposed natural-gas-liquids pipeline.

Four contracts with companies that were not Crosstex affiliates were introduced during the hearing. However, these four contracts require that Crosstex purchase the natural gas liquids before the product enters Crosstex's pipeline. These four contracts support the trial court's conclusion that any product that might be shipped by these shippers on the pipeline would be owned by Crosstex.

14

A fifth contract introduced during the hearing, titled "Interruptible Transportation Services Agreement," allows an unaffiliated company to ship on Crosstex's pipeline and to retain title to the product when the product is in transit. Iles explained that the unaffiliated company subject to the Interruptible Agreement had excess capacity in Baton Rouge where its affiliates could further process additional natural gas liquids. On cross-examination, Iles admitted that Crosstex's pipeline, as currently designed, does not connect with the unaffiliated shipper's location where the unaffiliated shipper desired to process its own natural gas liquids. According to Iles, Crosstex's pipeline currently terminates at processing plants owned by Crosstex affiliates.

In summary, the evidence allowed the trial court to determine, as a preliminary matter, that Crosstex was building a pipeline for the exclusive purpose of transporting its own natural gas liquids for further processing by Crosstex affiliates. On this record, the trial court's conclusion that Crosstex would probably be using the pipeline's entire capacity to transport its own natural gas liquids to Crosstex affiliates for further processing is reasonable.

We hold the trial court did not abuse its discretion by denying Crosstex's request for preliminary injunctive relief. *See Butnaru*, 84 S.W.3d at 204. Because the other arguments the parties have raised in the interlocutory appeal would not

15

result in greater relief, it is not necessary that we address them. *See* Tex. R. App. P. 47.1. We affirm the trial court's order.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on March 7, 2013
Opinion Delivered May 23, 2013
Before Gaultney, Kreger, and Horton, JJ.