In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00026-CV**
_____

**UNIO GLOBAL TRADE LLC, MICHAEL VOGEL, AND MARCELA VOGEL, Appellants**

**V.**

**ZINC POINT MANUFACTURING, INC., Appellee**

**On Appeal from the 284th District Court**
**Montgomery County, Texas**
**Trial Cause No. 22-12-17043-CV (after appeal**
**consolidated with Trial Cause No. 22-10-14637-CV)**

**MEMORANDUM OPINION**

Plaintiff Zinc Point Manufacturing, Inc. ("Appellee" or "Zinc Point") filed an Original Verified Petition, Application for Temporary Restraining Order, Temporary Injunction, Permanent Injunction, an Appointment of Receiver and Motion For Expedited Recovery in its suit against Defendants Unio Global Trade LLC ("Unio Global"), Michael Vogel, and Marcela Vogel (collectively "Appellants" or "Defendants") for tortious interference with prospective relations

1

and civil conspiracy.[1] After a hearing on the application for temporary injunction, the trial court granted the motion for temporary injunction in part and denied it in part.[2] In four issues, Appellants argue the trial court abused its discretion in granting Appellee's request for temporary injunction. We affirm.

## Background

According to Zinc Point's petition, Zinc Point is a company headquartered in Huntsville, Texas, that stores and ships ammunition and primers for firearms on behalf of its customers, and Zinc Point's primary supplier for primers is Servicios & Aventuras ("Servicios"). Originally Zinc Point handled sales, distribution, warehousing, and fulfillment. But, as of May 1, 2021, Baron Global, Zinc Point's affiliate, assumed responsibility for sales, distribution, and marketing for Zinc Point.

Zinc Point alleges that it was formed in 2015, that in 2018 Adolfo Rafael Vivas's company, Still American, LLC ("Still American"), acquired 10% of Zinc Point and Vivas became a director of Zinc Point, and Vivas's son was a manager of Zinc Point. Zinc Point alleges in its petition that Vivas became Chief Operating Officer in 2022 and handled Zinc Point's daily business operations.

---

[1] Zinc Point also sued Defendants Adolfo Rafael Vivas and his son, Adolfo Pedro Vivas, but they are not parties to this appeal. In this opinion, references to "Vivas" are references to Adolfo Rafael Vivas, unless otherwise specified.

[2] Because Zinc Point has not filed a cross-appeal from the partial denial of its motion for temporary injunction, we do not address that portion of the order in this appeal.

2

According to the petition, in late 2021 and early 2022 Vivas told another Zinc Point employee that Vivas intended to "destroy[,]" "tank[,]" and "force Zinc Point to fail[,]" because he was unhappy with Zinc Point's CEO. In September of 2022 Vivas indicated he was resigning as COO, and in October 2022 Vivas indicated he wanted to sell his interest in Zinc Point and Vivas intended to sell products from Servicios to competitors or customers of Zinc Point. Zinc Point alleged in its petition that in November 2022 it obtained information that "Vivas, while a Director and COO [of Zinc Point], devoted substantial time and resources, including Zinc Point resources, to establish Unio Global Trade, LLC, a competitor of Zinc Point[]" and that Vivas had "conducted dealings contrary to the interests of Zinc Point and for the benefit of himself, Unio Global, and Still American." That same month, Zinc Point's shareholders voted to remove Vivas as a director of Zinc Point. According to Zinc Point's petition, one of its representatives learned in December 2022 from Unio Global's registered agent that Unio Global had become the exclusive dealer of products from Servicios. Zinc Point alleged that, while Vivas was still COO of Zinc Point, he "was using Zinc Point[']s] resources to launch and bolster business for Unio Global[,]" as evidenced by a FedEx document that listed Zinc Point's warehouse address for shipment, but the document was addressed to Unio Global. According to Zinc Point's petition, 15 million primers were shipped to Zinc Point but Vivas told Zinc Point only 10 million were received, and then Vivas diverted 5 million primers

3

from Zinc Point to his own clients for Unio Global. Zinc Point alleged that Unio Global, Michael Vogel, and his wife Marcela, are assisting Vivas by working with him to sell primers to Zinc Point's customers and vendors and that the Defendants were using Zinc Point's warehouse address to ship primers it intended to use for Unio Global's business. According to the petition, Vivas, on behalf of his new company Still American, contracted with Steel Components to provide primers, which ultimately caused Steel Components to end its relationship with Zinc Point, and Vivas did so when Vivas was still a director and COO of Zinc Point. Zinc Point also alleged that Vivas requested funds and misled Zinc Point to believe that the funds were for paying an Amut North America invoice on behalf of Servicios for the benefit of Zinc Point, but Zinc Point later learned that the funds were used for products or services between Amut North America and Still American.

Zinc Point alleged in its petition that Vivas stole money from Zinc Point to fund his own competing business ventures by loaning Servicios $500,000 in March 2022 and Vivas then lied to Zinc Point by representing that Zinc Point had owed Servicios the $500,000. According to the petition, Vivas is in possession of 11.5 million primers purchased by Unio Global that "will presumably be sold to Zinc Point customers[,]" and Unio Global obtained possession of these primers through the use of the business relationship Vivas established with Servicios while Vivas "was a director of Zinc Point and/or using the $400,000 he took from Zinc Point as

4

part of an intended buyout with Zinc Point where [] Vivas never fully performed his obligations under the agreement."

Zinc Point sued Vivas for breach of fiduciary duty and for violations of the Texas Theft Liability Act, and Zinc Point sued all Defendants for tortious interference with prospective relations and civil conspiracy. Zinc Point sought damages, attorney's fees, and pre- and post-judgment interest.

Zinc Point also sought a temporary restraining order, temporary injunction, and permanent injunction prohibiting Defendants from accessing Zinc Point's funds and resources. According to Zinc Point, Defendants' conduct has caused and continues to cause Zinc Point irreparable and imminent injury that cannot be quantified and for which there is no adequate remedy at law; Zinc Point's business will be destroyed, its continued ability to remain in business would be threatened, and the status quo will be destroyed before a resolution to the dispute can be obtained if injunctive relief is not granted; money damages are not sufficient as relief; and based on the evidence in the record there is a substantial likelihood that Zinc Point will prevail on the merits as to its causes of action against Defendants. Zinc Point alleged that the harm faced by Zinc Point if the injunction is not granted outweighs the harm that would be sustained by Defendants if the injunctive relief is granted, the requested injunctive relief is narrow in scope, and granting injunctive relief

5

would not adversely affect public policy or public interest. Zinc Point requested entry of a restraining order and temporary and permanent injunction:

    a. Appointing an adequate receiver to take possession and control of Unio Global;
    b. Granting Zinc Point's request for expedited discovery and preservation;
    c. Prohibiting Defendants from contacting any of Zinc Point's customers, vendors, employees, or affiliates; and
    d. Prohibiting Defendants from importing from any of Zinc Point's vendors[];
    e. Prohibiting Defendants from selling 11.5 million primers in Defendants' possession that rightfully belong to Zinc Point;
    f. Prohibiting Defendants from selling, shipping, or moving any products that belong to Zinc Point to any party other than Zinc Point.

Attached as exhibits to Zinc Point's petition were Unio Global's filings with the Texas Secretary of State's Office, correspondence and invoices from FedEx Freight addressed to "Uni Global[,]" a temporary injunction in a related case[3], and a sworn verification of Walter Baronowski stating he had personal knowledge of certain portions of the petition.

The trial court, after examination of Zinc Point's pleadings, issued a Temporary Restraining Order and set a temporary injunction hearing to determine whether the trial court should issue a temporary injunction to prevent the Defendants during the lawsuit from:

---

[3] Prior to the filing of this appeal, a temporary injunction for a related case, trial cause number 22-10-14637-CV, was granted and that case has been consolidated with this case. According to Appellants, the consolidation of the related district court actions has no effect on this appeal.

1. Selling primers to Zinc Point[]'s customers and vendors []; and/or
2. Using Zinc Point[]'s warehouse address and/or Federal Express account to ship primers not for the benefit of Zinc Point []; and/or
3. Importing from any of Zinc Point[]'s vendors []; and/or
4. Selling any or all of the 11.5 million of Zinc Point[]'s primers in their possession.

### Evidence at the Temporary Injunction Hearing

<u>Testimony of Michael Vogel</u>

Michael Vogel (hereinafter "Vogel") testified that he is a founder and the registered agent of Unio Global, and he also operates and owns Vogel Digital Marketing, a marketing agency. Vogel testified that he and others formed Unio Global. According to Vogel, Unio Global was "purely a trading company" that did not produce anything, and that the entity was "formed for the sole purpose of acting as an import/export agent for a multitude of products[]" and to find products in high demand "and match them against procuring [foreign or domestic] products[.]" Prior to forming Unio Global, Vogel was not involved in selling, importing, or purchasing primers. Vogel testified that he had never worked with Zinc Point, Walter Baronowski, or Vivas (Vogel's uncle[4]), and that Vivas's son (Vogel's cousin) was a member and manager for Unio Global who provided the company with "procurement[,] logistic support[,] and some sales[.]" Vogel's wife, Marcela, was one of Unio Global's members and she worked in a clerical capacity for Unio Global.

---

[4] Vogel later clarified that although he refers to Vivas as his "uncle," Vivas is Vogel's father's first cousin.

According to Vogel, Unio Global brought in Gerardo Krautmann, an employee of Servicios, as a manager consultant for Unio Global because Unio Global and Servicios had a relationship where Servicios would purchase and then supply Unio Global with products and Unio Global would help pay for equipment and products for Servicios. According to Vogel, at the time that Vivas was working with Zinc Point, Vogel discussed with Vivas that Vogel was forming Unio Global. Vogel testified that although he never worked with Zinc Point, he had prepared a proposal for marketing for Zinc Point that never materialized, his only contact with Zinc Point was Vivas (his uncle), and his basic understanding of Zinc Point was that it was a company owned by Vivas that manufactured ammunition. According to Vogel, Vivas introduced Vogel to Servicios for the sale of primers, and after that introduction and a few months before the hearing, Unio Global obtained a license through ATF to import ammunition and ammunition components. Vogel testified that Vivas also referred Unio Global to FAMAE, the Chilean government's manufacturing company for weapons and ammunition, around March of 2022 and that at the time Vogel understood from Vivas that Zinc Point was a purchaser of FAMAE products, but Vogel said he was not aware that Zinc Point was a supplier to FAMAE. Shortly after Unio Global was formed, Vogel prepared bids as part of "a competitive bidding process" to supply FAMAE with primers and other products, and FAMAE selected Unio Global for a small purchase around August of 2022.

8

Vogel testified that he was introduced to Jones Securities through Servicios, and he did not know Jones Securities LLC was a customer of Zinc Point. Vogel testified that he was not aware that Unio Global was working with Zinc Point customers and suppliers, and that he only recently learned that Servicios was a supplier of primers to Zinc Point. According to Vogel, Unio Global would purchase primers from Servicios that were imported by Still American. Vogel testified that he initially communicated to others that Unio Global had an exclusive relationship with Servicios, but after he received official confirmation otherwise in October of 2022, Unio Global desisted in making those representations. Vogel testified that he was aware that Vivas had an ATF license as well and that at some point Vivas had a dispute with the other owners of Zinc Point, but Vogel was not aware at the time he formed Unio Global that Vivas had signed a non-competition agreement with Zinc Point or that Vivas had a dispute at that time with any of Zinc Point's owners. Vogel testified that Unio Global sold primers up until the trial court entered the temporary restraining order against Unio Global. According to Vogel, to his knowledge Unio Global never used Zinc Point's address (500 Highway 19 in Huntsville, Texas) as Unio Global's address and never had items sent there, and Unio Global did not have a FedEx account.

Vogel testified that in September of 2022, Unio Global had two transactions to purchase small pistol primers from RUAG, who was introduced to Unio Global

through Vivas. According to Vogel, each transaction was for a purchase of 5 million primers manufactured by Servicios and that the shipments were made from Zinc Point's warehouse. Vogel explained that the "shipments" were actually pallets that the client, RUAG, arranged to pick up at Unio Global and that RUAG would provide the bill of lading. Vogel testified that the only person from Zinc Point that he involved in the transaction was Vivas, whom Vogel believed was the owner of Zinc Point. According to Vogel, it was his understanding that for the first 5 million primers, Servicios made the connection for the primers to be brought in and Servicios negotiated the sale to RUAG who was going to pick up the product, but that Unio Global was to serve as the commercial entity that would actually sell the 5 million primers at the previously arranged price of $40 per thousand and "realize the sale." For the second 5 million primers, the transaction was different than the first in that Unio Global was able to set a higher price and negotiate with RUAG to accept a slightly higher price, $43.25 per thousand. According to Vogel, Unio Global's relationship with Servicios is predicated on the services they provide to Servicios by Unio Global purchasing the primers from Servicios for $23 per thousand, Servicios invoices Unio Global for $15 per thousand, the balance is held by Unio Global to procure product for Servicios to send to Servicios. Vogel testified that through referrals from Servicios, Unio Global was able to build a list of potential customers and on a few instances when Vogel followed up on those leads, he learned

that the potential customers had been customers of Zinc Point. According to Vogel when he entered into transactions on behalf of Unio Global to sell Servicios primers to customers he did not do so with any desire to interfere with any relationship between Zinc Point and any customer.

Vogel testified that at the time of trial, Unio Global had in its inventory 6.5 million primers that it had paid for and acquired from Servicios at a price of $23 per thousand. Upon the entry of the temporary restraining order and in order to comply with the order, Unio Global cancelled the sale of a pallet of 1.5 million of primers to Jones Securities that had been paid for but not picked up yet, and Unio Global refunded that sale. Another transaction for 1.5 million primers sold to Southern Specialties, a company not referred by Vivas to Unio Global, was also cancelled due to the temporary restraining order. Unio Global also had a shipment of 15 million primers that were coming from Servicios at the time of the entry of the temporary restraining order.

Vogel denied that he told Sonny Hildreth that Unio Global was the sole supplier for Servicios, and Vogel testified that he knew through discussions with Servicios that Unio Global was not an exclusive distributor. According to Vogel, Hildreth seemed suspicious when he presented himself as the person picking up the primers on behalf of Jones Securities, and he was evasive and not very knowledgeable about bills of lading or Jones Securities. Vogel denied that he had

11

ever told Unio Global's customers not to buy products from Zinc Point or Baron Global and that no one has asked him to do so.

Testimony of Claude "Sonny" Hildreth

Sonny Hildreth, a private investigator and retired FBI agent, testified that he was hired by Zinc Point's counsel to pick up a load of primers in Magnolia, and Zinc Point's counsel provided Hildreth with Michael Vogel's name and an address and phone number. Hildreth contacted Vogel using an alias and arranged a time and date for Hildreth to pick up 1.5 million small caliber primers under the guise of picking them up on behalf of Jones Securities, and Hildreth confirmed the address for the facility where he was to pick them up. According to Hildreth, he arrived at the address, a gated warehouse, on December 12, 2022, and Vogel arrived and unlocked the gate. Hildreth testified that he provided Vogel with a bill of lading that Vogel had asked him to bring, but that Hildreth was unaware of who created the bill of lading that he brought to Vogel. Hildreth testified that he asked Vogel if he had the remainder of the 14 million primers that had at one time been discussed with Charles Jones (of Jones Securities), and Vogel told Hildreth that after that pickup of the 1.5 million primers there would only be 11 million left. According to Hildreth, he was told the 1.5 million primers he was picking up were manufactured by Servicios and Hildreth told Vogel that Charles Jones was surprised by this because when he had attempted to buy directly from Servicios he was told that he would have to go

through Zinc Point and Vivas because Zinc Point was the sole company that handled the product. Hildreth testified that Vogel told Hildreth that Vogel's company, Unio Global Trading, was now the exclusive distributor for the product in the United States. Hildreth testified that as for the remaining 11 million primers, Vogel told him that Vogel was the exclusive dealer, that he was moving his facility from that location to another location, and that Unio Global planned on getting a shipment every three weeks from Servicios. According to Hildreth, the 1.5 million primers he picked up he understood had been purchased by Jones Securities, and he took them to Zinc Point in Huntsville, Texas. Hildreth testified that he did not know what the arrangement was between Jones Securities and Zinc Point regarding the 1.5 million primers he picked up, he did not know how Jones had paid for the primers, and he believed that he was legally picking up product and delivering it.

Testimony of Jeff Vincent

Jeff Vincent testified that he is an employee of Zinc Point at 500 State Highway 19 in Huntsville, and that Vivas and Baronowski own an interest in Zinc Point. According to Vincent, Vivas hired him about three years earlier when Vincent had been previously unemployed, and he worked for Zinc Point in Mineral Wells, and Vincent continued to work for Zinc Point when the company moved to Cleburne and then Huntsville. Vincent testified he worked closely with Vivas because it was just the two of them when the company started out and that Vivas treated him well.

According to Vincent, he only interacted with Baronowski two or three times a year because Baronowski lived in Miami. Vincent testified that on Vivas's last day at the facility in Huntsville, he told Vincent and a couple of other employees that he was going to "basically just kind of retire," and he told Vincent to "just stick in there and, you know, see what happens[]" regarding Vincent's future. Vincent testified that he has never met Vogel or Vogel's wife, and that he has only met Vivas's son twice in a social context.

Vincent testified that he recognized the document admitted as Exhibit 3 as a FedEx document that was kept in Zinc Point's files that he had signed, and that the document was for the shipment of 5 million primers. The first page of Exhibit 3 was a "Past Due Statement" from FedEx for a freight bill # 9634711240 owed by "Uni Global" at the address 500 Highway 19 in Huntsville, Texas for shipment on September 12, 2022 and listed the shipper as "Uni Global" and the consignee of the shipment as "RUAG Ammotec USA" at an address in Savannah, Georgia. The third page of Exhibit 3 was a "Past Due Invoice" for the same shipment and the invoice listed primers as the items shipped. The fifth page of Exhibit 3 is a FedEx "Weight Validation Certificate" for the same shipment and lists the shipper as "Uni Global" with the same Huntsville address but lists the consignee as "Norma Precision" in Savannah, Georgia. The sixth page of Exhibit 3 is a FedEx "Bill of Lading" for the FedEx shipment of two pallets of primers; it lists the shipper as "Unio Global" and

14

the name "Michael" in the "Attn to" line; it lists the consignee as "Norma Precision, Inc." in Savannah, Georgia; and lists the freight charges to be paid by Norma Precision. At the bottom of the Bill of Lading is a shipper certification signed by "Jeff Vincent" on 09/12/22. The seventh page of Exhibit 3 is a Fed Ex "Bill of Lading" for the same shipment but is marked in handwriting as "Corrected BOL" and lists similar information as the prior Bill of Lading but instead lists the freight charges to be paid by RUAG, and it lists under the freight "2 Pallets 5,000,000 pieces[.]" The eighth and ninth pages of Exhibit 3 are the FedEx "Delivery Receipt" for the shipment and that was signed as received on September 14, 2022.

Vincent testified that typically either Baronowski, Vivas, or a man named Tarek would inform Vincent of a shipment, one of them would provide Vincent with a bill of lading so he could prepare the shipment to go out, and the customer hired a freight provider to come pick up the primers from the warehouse. Vincent testified that Exhibit 3 listed Unio Global as the shipper and that Vivas had directed Vincent to ship the products. Vincent testified that Vivas had not explained Vivas's connection with Unio Global, that Vincent trusted Vivas to only direct him to ship a shipment for Zinc Point, and that Vincent has since discovered that this shipment was not a Zinc Point shipment but was instead a shipment from Unio Global to Norma Precision, Inc., who was one of Zinc Point's previous customers. According to Vincent, this was the only shipment with Unio Global's name on it that Vivas

15

asked Vincent to ship. Vincent testified that his role was to gather the primers that were to leave the Zinc Point warehouse and make them available for pick-up by FedEx Freight, but that he was not involved in contacting FedEx Freight to arrange for pick-up or arrange for Zinc Point to pay for FedEx to pick up the freight. He testified he had not seen the corrected Bill of Lading for the shipment, and he also had no knowledge of whether Zinc Point funds were used to deliver the primers to Zinc Point's warehouse. According to Vincent, he had no idea who arranged for FedEx Freight to pick up the primers and that typically the customer, and not Zinc Point, would arrange for that. Vincent testified that, to his knowledge, he has never been involved with another transaction with Unio Global and he was not familiar with Michael Vogel. Vincent testified that in the summer of 2022, Vivas discussed with him another business Vivas was forming, and Vivas mentioned the possibility of Vincent coming to work for Vivas.

Testimony of Ben Sessions

Ben Sessions testified that he is the vice president of operations for Zinc Point, that he started out as an independent consultant for the company in 2021 and became an employee of the company in April of 2022. According to Sessions, he is the only employee of the twenty-or-so employees that does not have a non-disclosure agreement with Zinc Point. Sessions testified that he has known Vivas since the inception of Zinc Point in Florida six years ago, when Sessions was introduced to

16

the company through his friend, Baronowski. According to Sessions, Vivas was in charge of the manufacturing and the ATF side of the business. Sessions testified that once he started working full-time at the Huntsville factory in May of 2022, he would not see Vivas on a consistent daily basis, but Vivas had full access to the warehouse.

Sessions testified that in September of 2022 he met with Vivas for a lunch meeting at a restaurant in The Woodlands, Texas, to try to broker a separation agreement between Baronowski and Vivas because Vivas was leaving Zinc Point. Sessions testified that Vivas suggested that Zinc Point would not last longer than six to eight months because Baronowski was mismanaging the business and as a result the company would be basically decimated. Sessions testified that Vivas told him that he did not want to be hindered by the non-compete agreement he had with Zinc Point, that he wanted to do business anywhere and sell anything he wanted, and he suggested that he would give Sessions his shares of the company if Sessions could broker a deal that would release Vivas from the non-compete agreement. According to Sessions, he told Vivas how the separation of Zinc Point's two partners would be extremely detrimental to the company, the two partners, and others. Sessions testified that Vivas responded that Vivas did not have any assets to go after, he had transferred money to other people, and that Baronowski would be the only person to bear the full weight of the separation. Sessions testified that after the lunch when he was on his way to drop off Vivas at home, Vivas told him about a business that was

17

going to be substantial and make a lot of money and that if Sessions would agree to join the business, then Vivas would tell him who the other business partners were and what the other business was. According to Sessions, he did not agree to join the new business, so Vivas never told him about the new business or its partners.

Sessions testified that Vivas's access to the warehouse ended on September 9, 2022, when Vivas handed Sessions his car, keys, and a cut up credit card a week before Sessions's last interaction with Vivas at the factory. According to Sessions, this was around the same time as when Vivas was taken off Zinc Point's payroll and when Vivas separated from Zinc Point.

Sessions testified that at some point he received Zinc Point's checkbook back from Vivas, and checks 1809 through 1815 and their corresponding check stubs were missing. The only missing check that Zinc Point recovered was a check to Intermodal, admitted as Exhibit 7, that Sessions testified was written in Vivas's handwriting, and Vivas had noted on the reference line of the check that the payment was for "Lost two shipments from Servicios, Invoice # 304556" and then something illegible. Sessions testified that the check appeared to be a payment for shipments from Servicios, that the only "Servicios" that he was aware of Zinc Point doing business with was Servicios & Aventuras, and that Zinc Point was able to stop payment on that check. According to Sessions, to his knowledge Zinc Point was unable to recover or stop payment on the other missing checks. According to

18

Sessions, Servicios has not done any business with Zinc Point in the past few weeks before the hearing, but prior to that Servicios had provided primers to Zinc Point.

Testimony of Walter Baronowski

Walter Baronowski testified that his background is in finance and banking, and he became involved in the ammunition business in 2015. According to Baronowski, he was convicted of a felony for not informing the FBI of a rebate between an agent and a client and, although the felony had nothing to do with the ammunition business, his felony record impeded his ammunition business because he could not obtain an ATF license and financing and he had to focus on activities for the business that did not require a license through the ATF. Baronowski testified that he had to rely on third parties to stand in as a registered party because of his felony record. Baronowski testified that he owns ninety percent of Zinc Point and one hundred percent of Baron Global, and that KPMG advised the creation of Baron Global. Baronowski testified that Zinc Point is a "warehouse and fulfillment business[]" that "stores and ships goods," and Baron Global "handles the marketing, the distribution, and the procurement, from a sales standpoint, but utilizes Still American to actually do all licensed activities." Still American obtained primers primarily from Servicios, but also from Steel Components, FAMAE, and other companies, and then Still American provided those primers to Zinc Point. Baronowski testified that Zinc Point also bought products from Norma Precision and

bought from and sold products to Jones Securities. According to Baronowski, Zinc Point's relationships with the companies supplying the primers, especially Servicios, were invaluable.

Baronowski testified that when he partnered with Vivas in 2016 to form Zinc Point, Vivas was someone he had thought of like a father for a long time and trusted and Vivas was Chief Operating Officer and in charge of manufacturing at Zinc Point's warehouse. At one point, Vivas brought Vogel to Zinc Point's attention and Vivas thought that Zinc Point should use Vogel's marketing company to provide marketing services for Zinc Point and later Baron Global, and Vivas never told Baronowski that Vogel was a relative of Vivas's. Baronowski testified that Vivas agreed to sign "a non-compete, a non-circumvent, a non-solicitation." A copy of the non-compete agreement executed by Vivas and Baronowski was admitted at the injunction hearing, and Baronowski testified that the agreement protected Zinc Point's confidential data such as customers and vendors, the way in which the product is manufactured and sourced, pricing and contact information, and its employees from being induced to leave the company.

Baronowski testified that in March of 2022, he discussed with Vivas buying him out of the business. According to Baronowski, the terms of the agreement were that he would pay Vivas $1.5 million the first year and $2 million over the next two years in exchange for Vivas helping to transition his position to a third party while

20

Vivas would maintain his license and continue to import product. Baronowski paid Vivas $400,000 as part of the negotiation and the agreement was that Vivas would retire but would assist Zinc Point for two years. A copy of the last version of the separation agreement between Baronowski and Vivas was admitted into evidence, and Baronowski testified that Vivas did not do what he agreed to.

According to Baronowski, Vivas never mentioned Unio Global during the negotiation, and Baronowski first heard of Unio Global when Baronowski's associate, Tarek, was informed by one of Zinc Point's vendors that another company was selling Servicios primers. When Tarek inquired into the other company, he determined that the company "was [Vivas's son] and Michael Vogel." Baronowski testified that he and Tarek looked at Vivas's emails and they discovered Vivas had contacted Vogel previously on behalf of Zinc Point and Baron Global for marketing, and Baronowski and Tarek "put two and two together." According to Baronowski, he was shocked when he saw the document at the injunction hearing that indicated Unio Global was created in February of 2022. Baronowski testified that Vivas stopped being paid from Zinc Point's payroll at Vivas's request on September 9, 2022.

Baronowski testified that in the months prior to the injunction hearing, the relationship between Zinc Point and Servicios was "severely crippled[]" because Zinc Point's clients have moved to Unio Global. Baronowski testified that Zinc

Point's relationship with FAMAE had been damaged, but not to the extent of the damage to Zinc Point's relationship with Servicios, and Baronowski had learned that FAMAE was holding product that Zinc Point had paid for until Zinc Point's counsel, Vivas, or Still American directed it to be delivered.

According to Baronowski, in late August and early September of 2022, Zinc Point was in "extremely short supply[]" of primers and were expecting shipments to come in. Baronowski testified that when the shipments came in, Vivas told them that only 10 million had come in, which was an insufficient amount to fill the orders. Baronowski testified that "[o]riginally we were told that 15 were, and we were not informed of this other shipment that was mentioned earlier. I was under the assumption previous to today that only 5 million primers had been moved, not 10." Baronowski testified that in his petition he alleged the specific quantity of Servicios primers that were diverted from the Zinc Point factory by Unio Global to a vendor which resulted in a loss to Zinc Point because Baron Global would have been able to sell those primers, and Baronowski testified that Unio Global was still in possession of 11.5 million primers when Hildreth went there. According to Baronowski, during that time, Zinc Point was unable to meet its customer obligations and was unable "to produce 9mm for a number of months because of what [Vivas] did." Baronowski testified that the last time Zinc Point received primers from Servicios was the primers Hildreth purchased, and Servicios would now only sell to

Zinc Point if Vivas "signed off on it[]" which he has not. According to Baronowski, his purchase price for primers from Servicios and the profit margin was known by Vivas and was supposed to be confidential to Zinc Point, and knowledge of that information would allow a competitor to undercut Zinc Point and did so to Zinc Point's detriment. Baronowski testified that the primers have been sold for as much as $100 per thousand and were being sold for around $60 or $70 per thousand at the time that Unio Global got involved, and that the lost sales were a result of Vogel dropping the price in an effort to compete and take Zinc Point's customers.

Baronowski testified that, although Zinc Point and Baron Global sold other products, the majority of the profitability came from the sale of primers which was the business with Servicios. Baronowski testified that as a result of the competition by Unio Global, Zinc Point's business has "been decimated[,]" Zinc Point's online traffic has dropped about sixty or seventy percent, Zinc Point had previously been averaging $50,000 a day in revenue but currently was only averaging between $5,000 and $10,000 a day, there have been layoffs, product quality has decreased, complaints against the company have increased, orders have had to be canceled (specifically having to do with the primers shipment that Vivas diverted from the company in September of 2022), and the organization has suffered from a number of issues.

23

The Temporary Injunction

After the hearing, the trial court issued the following temporary injunction until a judgment rendered becomes final or until further order of the trial court:

It is ordered that Adolfo Rafael Vivas, Michael Vogel, Unio Global Trade LLC, and Marcela Vogel, their assigns, and all persons or entities acting in concert with or at the direction of them or any of them:
1. Shall not use Zinc Point[]'s warehouse, its warehouse address, and/or its Federal Express account for any purpose; and
2. Shall not sell, transfer, or convey any or all of the 11.5 million primers in their possession located possibly in Magnolia, Texas.

In its order, the trial court found the following, in pertinent part:

[] *Elements for Temporary Injunction*
The Court finds that Zinc Point [] has valid causes of action against Adolfo Rafael Vivas, Michael Vogel, Unio Global [], and Marcela Vogel, that it has a probable right of recovery on its causes of action, and that it faces a probable, imminent and irreparable harm in the absence of this Temporary Injunction insofar as it appears that:
- Adolfo Rafael Vivas, who is Zinc Point[]'s 10% minority owner, Chief Operating Officer, and second highest ranking executive began diverting business opportunities and inventory of Zinc Point [].
- Adolfo Rafael Vivas was assisted by Michael Vogel and Marcela Vogel in this endeavor in order to insulate himself from direct responsibility.
- In furtherance of this campaign:
  - Michael Vogel formed Unio Global [] to serve as the entity through which the trades would be conducted and utilized leads provided by Adolfo Rafael Vivas to create business opportunities which would, otherwise, have belonged to Zinc Point [];
  - Adolfo Rafael Vivas provided not only customer contacts to Michael Vogel, but also used Zinc Point[]'s inventory

24

its storage/warehouse space, and its address in order to provide materials to customers of Zinc Point [] under Unio Global [];

- Adolfo Rafael Vivas moved all of his assets in order to make himself judgment proof, while predicting that Zinc Point [] would go out of business in a matter of months as a result of this scheme; and

- Michael Vogel acting for Unio Global [] took possession of 14 million primers, 1.5 million of which were intended to be delivered to Jones Security, LLC, but were actually delivered to a private investigator in Magnolia, Texas who then returned them to Zinc Point[]'s location in Huntsville, Texas.[5]

- Adolfo Rafael Vivas began this campaign with Michael Vogel and Marcela Vogel while he was acting Chief Operating Officer. That is, Adolfo Rafael Vivas was using Zinc Point[]'s resources for Unio Global Trade LLC's benefit and to Zinc Point[]'s harm all while still acting Chief Operating Officer of Zinc Point [].

The irreparable harm is that Zinc Point [] will be and has been divested of its property and with the stated goal to end its existence, the current path if not interrupted by this Temporary Injunction will lead to the irreparable harm of Zinc Point [] ceasing operations. Indeed, layoffs have begun in order to keep Zinc Point [] afloat. Further, even if damages were available, Adolfo Rafael Vivas has been moving and hiding his assets in order to avoid judgment collection.

Issues on Appeal

Appellant argues in four issues that the trial court abused its discretion in granting the temporary injunction. The four issues as stated by Appellant are as follows:

1. Did the trial court abuse its discretion in granting Zinc Point's request for a temporary injunction against Appellants where the

---

[5] In the footnote in the original, the trial court explained that, "Mathematically, 12.5 million would be left, but when asked about the math, Zinc Point [] insisted that the amount was actually 11.5 million."

evidence proffered at the hearing demonstrates that Appellee has an adequate remedy at law?

2. Did the trial court abuse its discretion in enjoining Appellants from selling, transferring, or conveying certain products in their possession where the injunction was based on a finding that the products belonged to Zinc Point, which finds no support in the evidence presented at the temporary injunction hearing?

3. Did the trial court abuse its discretion in enjoining Appellants from selling, transferring, or conveying certain products in their possession where there was no plausible connection between the trial court's prohibitory injunction and the stated irreparable harm, Zinc Point's ability to continue its business?

4. Did the trial court abuse its discretion in granting Zinc Point's request for a temporary injunction against Appellants where no evidence was proffered at the temporary injunction hearing that Appellants acted with a conscious desire to prevent a relationship from occurring between Zinc Point and its customers or prospective customers or that interference was certain or substantially certain to occur as a result of Appellants' conduct?

Standard of Review and Applicable Law

"A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (citations omitted). To obtain a temporary injunction, an applicant must show: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Id.*; *see also Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 916 (Tex. 2020). The party seeking a temporary injunction bears the burden of production to offer some evidence establishing a

26

probable right to relief. *In re Tex. Nat. Res. Conservation Comm'n*, 85 S.W.3d 201, 204 (Tex. 2002) (citing *Camp v. Shannon*, 348 S.W.2d 517, 519 (Tex. 1961)). The party must show that it is entitled to preservation of the status quo pending trial on the merits. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993).

The decision to grant or deny a temporary injunction rests within the trial court's sound discretion. *Butnaru*, 84 S.W.3d at 204; *Se. Tex. Veterinary Clinics, PLLC v. Wilcox*, No. 09-21-00083-CV, 2022 Tex. App. LEXIS 5791, at **19-20 (Tex. App.—Beaumont Aug.11, 2022, no pet.) (mem. op.). We may not overrule a trial court's decision unless the trial court acted unreasonably, or in an arbitrary manner, without reference to guiding rules or principles, and we cannot substitute our judgment for that of the trial court. *Butnaru*, 84 S.W.3d at 211. In reviewing the evidence from a temporary injunction hearing, and when a trial court has not been requested to enter findings of fact or conclusions of law, we view the evidence submitted to the trial court in the light most favorable to the trial court's order drawing all legitimate inferences from the evidence, and we indulge every reasonable inference in favor of the trial court's order. *Se. Tex. Veterinary Clinics, PLLC*, 2022 Tex. App. LEXIS 5791, at **19-20 (citing *Crosstex NGL Pipeline, L.P. v. Reins Rd. Farms-1, Ltd.*, 404 S.W.3d 754, 757 (Tex. App.—Beaumont 2013, no pet.)); *see also CRC-Evans Pipeline Int'l, Inc. v. Myers*, 927 S.W.2d 259, 262 (Tex. App.—Houston [1st Dist.] 1996, no writ). Our review of the trial court's decision is

limited to the validity of its temporary injunction order; otherwise, we do not consider the merits of the underlying case. *Davis v. Huey*, 571 S.W.2d 859, 861-62 (Tex. 1978); *see also Henry v. Cox*, 520 S.W.3d 28, 33-34 (Tex. 2017). However, a temporary injunction will be dissolved if it is based on an erroneous application of the law to the facts. *See Dall. Gen. Drivers, Warehousemen and Helpers v. Wamix, Inc., of Dall.*, 295 S.W.2d 873, 879 (Tex. 1956). A trial court abuses its discretion when it acts arbitrarily and unreasonably, without reference to guiding rules or principles, or misapplies the law to the established facts of the case. *Se. Tex. Veterinary Clinics, PLLC*, 2022 Tex. App. LEXIS 5791, at *20 (citing *Pressley v. Casar*, 567 S.W.3d 327, 333 (Tex. 2019); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)). If some evidence reasonably supports the trial court's decision, the trial court does not abuse its discretion. *Butnaru*, 84 S.W.3d at 211; *Se. Tex. Veterinary Clinics, PLLC*, 2022 Tex. App. LEXIS 5791, at *20. "An abuse of discretion does not exist where the trial court bases its decisions on conflicting evidence." *Davis*, 571 S.W.2d at 862.

## Analysis

In Appellants' first issue, they argue that the evidence at the hearing established that Zinc Point has an adequate remedy at law. In Appellants' second issue, they argue that no evidence at the hearing supported the trial court's finding that the 11.5 million primers it prohibited Appellants from selling, transferring, or

conveying, belonged to Zinc Point and that Zinc Point "had been divested of its property[.]" In Appellants' third issue, they argue that there is "no plausible connection" between the trial court's temporary injunction enjoining Appellants from selling, transferring, or conveying the 11.5 million primers and Zinc Point's stated irreparable harm.

In a temporary injunction proceeding, whether a party has suffered an irreparable injury and whether the party has an adequate remedy at law are issues that are intertwined. *Rollins v. Universal Coin & Bullion, Ltd.*, No. 09-06-150-CV, 2006 Tex. App. LEXIS 8764, at *13 (Tex. App.—Beaumont Oct. 12, 2006, no pet.) (mem. op.) (citing *Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 294 (Tex. App.—Beaumont 2004, no pet.)). "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. Disruption of business can be irreparable harm. *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied) (also explaining that "assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy[]"); *David v. Bache Halsey Stuart Shields, Inc.*, 630 S.W.2d 754, 757 (Tex. App.—Houston [1st Dist.] 1982, no writ) ("This harm would not only disrupt the organized business dealings of Bache but would also threaten customer confidence in Bache's handling

of their private affairs, and probably cause Bache to lose not only customers but profits as well.").

We conclude there is some evidence of irreparable harm and an inadequate remedy at law in the record before us. For example, the trial court heard Baronowski testify that in late August and early September of 2022, Zinc Point was in "extremely short supply" of primers and were expecting shipments to come in. Baronowski testified that when the shipments came in, Vivas told them that only 10 million had come in, which was an insufficient amount to fill the orders. Baronowski testified that "[o]riginally we were told that 15 were, and we were not informed of this other shipment that was mentioned earlier. I was under the assumption previous to today that only 5 million primers had been moved, not 10."

Baronowski testified that in his petition he had alleged the specific quantity of Servicios primers that were diverted from the Zinc Point factory by Unio Global to a vendor which resulted in a loss to Zinc Point because Baron Global would have been able to sell those primers, and Baronowski testified that Unio Global was still in possession of 11.5 million primers when Hildreth went there. According to Baronowski, during that time, Zinc Point was unable to meet its customer obligations and was unable "to produce 9mm for a number of months because of what [Vivas] did." Baronowski testified that, although Zinc Point and Baron Global sold other products, the "majority of the profitability" came from the sale of primers which was

30

the business Zinc Point had with Servicios. Baronowski testified that as a result of the competition by Unio Global, Zinc Point's business has "been decimated[,]" Zinc Point's online traffic has dropped about sixty or seventy percent, Zinc Point had previously been averaging $50,000 a day in revenue but currently was only averaging between $5,000 and $10,000 a day, there have been layoffs, product quality has decreased, complaints against the company have increased, orders have had to be canceled (specifically having to do with the primers shipment that Vivas diverted from the company in September of 2022), and the organization has suffered from a number of issues.

This testimony is some evidence to support the trial court's conclusion that, absent a temporary injunction, there will be irreparable harm, and Zinc Point will be and has been divested of its property and that the current path would lead to Zinc Point ceasing operations. Viewing the evidence in the light most favorable to the trial court's ruling, as we must, we cannot say it abused its discretion in determining that Zinc Point met its burden of showing an imminent and irreparable injury in the absence of a temporary injunction and that it had no adequate remedy at law. *See Henry*, 520 S.W.3d at 34; *Butnaru*, 84 S.W.3d at 204; *Davis*, 571 S.W.2d at 862. We overrule issues one, two, and three.

In Appellants' fourth issue, they assert that the evidence does not support that Zinc Point has a probable right to recover on its claims against Appellants.

Specifically, Appellants argue that (1) the evidence at the hearing establishes that after May 2021 the sales with which Appellants allegedly interfered were sales of Baron Global and not Zinc Point, and (2) there was no evidence presented at the hearing supporting the trial court's finding that Appellants consciously wanted to prevent relationships between Zinc Point and its customers or potential customers or that such interference was substantially certain to be caused by Appellants' conduct.

To show a probable right to relief, an applicant need not show that it will prevail at trial. *Butnaru*, 84 S.W.3d at 211 (citing *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968)). Instead, to show a probable right of recovery, the applicant must plead a cause of action and present some evidence that tends to support it. *Camp*, 348 S.W.2d at 519; *Rocklon, LLC v. Paris*, No. 09-16-00070-CV, 2016 Tex. App. LEXIS 11393, at *6 (Tex. App.—Beaumont Oct. 20, 2016, no pet.) (mem. op.) (citing *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 857 (Tex. App.—Fort Worth 2003, no pet.)); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 23-24 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd).

Here, Zinc Point brought claims against Appellants for tortious interference with prospective relations and civil conspiracy. The trial court heard the testimony of Baronowski as previously discussed above, it also heard testimony regarding Vivas, his son, and others in forming Unio Global and in conducting business

directly in competition with Zinc Point despite entering into a non-compete agreement with Zinc Point, it heard Vogel's testimony regarding Unio Global's possession of primers that Baronowski testified belonged to Zinc Point, Vogel's testimony regarding contacting and transacting with Zinc Point's customers, and Hildreth's testimony regarding him picking up primers from Vogel under the guise of Jones Securities that Zinc Point alleged belonged to Zinc Point, and the trial court was also presented with FedEx records related to Unio Global shipments of primers for "Uni Global" using Zinc Point's warehouse address. Viewing this evidence in the light most favorable to the trial court's injunction order, we conclude Zinc Point put on some evidence tending to support at least one of its claims against Appellants. Based on Zinc Point's allegations and this evidence, the trial court could have reasonably concluded that Zinc Point had a probable right to recovery. *See Butnaru*, 84 S.W.3d at 211. We overrule issue four.

To summarize, we conclude that there is some evidence to support the trial court's decision to issue the temporary injunction and we cannot say that the trial court abused its discretion in granting the temporary injunction. *See id.* at 204, 211; *Se. Tex. Veterinary Clinics, PLLC*, 2022 Tex. App. LEXIS 5791, at **19-20. Having overruled Appellants' issues, we affirm the trial court's order.

AFFIRMED.

LEANNE JOHNSON<br>Justice

Submitted on March 13, 2024
Opinion Delivered April 18, 2024

Before Golemon, C.J., Johnson and Wright, JJ.